# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-009

Filing Date: February 15, 2021

No. S-1-SC-38396

MICHELLE LUJAN GRISHAM, Governor
of New Mexico; KATHYLEEN KUNKEL,
Secretary of the New Mexico Department of Health,

 Petitioners,

v.

HONORABLE RAYMOND L. ROMERO,
District Court Judge, Fifth Judicial District Court,

 Respondent,

and

OUTLAW MEATS, LLC,
a New Mexico Limited Liability Company;
F-2 ENTERPRISES, INC., d/b/a TEXAS CLUB
GRILL & BAR, a New Mexico Corporation;
K-BOBS OF RATON, INC., a New Mexico Corporation;
K-BOBS OF LAS VEGAS, INC., a New Mexico Corporation;
B.M.B. FINANCIAL, LLC, d/b/a TRINITY HOTEL,
a New Mexico Limited Liability Company;
RED RIVER BREWING COMPANY, LLC,
a New Mexico Limited Liability Company; and
NEW MEXICO RESTAURANT ASSOCIATION,

 Real Parties in Interest.

## ORIGINAL PROCEEDING

Released for Publication April 6, 2021.

Office of the Governor
Matthew L. Garcia, Chief General Counsel
Jonathan Jacob Guss, Deputy General Counsel
Santa Fe, NM

for Petitioners

Honorable Raymond L. Romero
District Court Judge, Fifth Judicial District
Carlsbad, NM

for Respondent

Law Office of Angelo J. Artuso
Angelo J. Artuso
Albuquerque, NM

Patrick J. Rogers, LLC
Patrick J. Rogers
Albuquerque, NM

Roybal-Mack & Cordova Law, P.C.
Antonia Roybal-Mack
Amelia P. Nelson
Darren Lee Cordova
Albuquerque, NM

for Real Parties in Interest

Tabor & Byers, L.L.P.
Justin Stewart Raines
Cas F. Tabor
Carlsbad, NM

for Amicus Curiae
Eddy County

Jonathan M. Diener
Mule Creek, NM

for Amicus Curiae
Jalisco Café

Harrison & Hart, LLC
Carter B. Harrison, IV
Albuquerque, NM

for Amici Curiae
Republican Party of New Mexico, House Minority Leader Jim Townsend, and Senate
Minority Leader Stuart Ingle

**OPINION**

**NAKAMURA, Justice.**

**{1}**     This case presents the Court with yet another opportunity to address the difficult questions surrounding the executive branch's authority to impose business restrictions during a pandemic.  Here, we answer two questions: (1) whether Petitioners are authorized to restrict or close businesses when necessary for the protection of public health and (2) whether the renewed temporary closure of indoor dining at restaurants and breweries, mandated by the July 13, 2020, emergency public health order (July Order), *see* N.M. Dep't of Health, Public Health Order at 5 (July 13, 2020),[1] was arbitrary and capricious.  With respect to the first question we hold, consistent with our opinion in *Grisham v. Reeb*, 2021-NMSC-006, ¶¶ 25-33, 480 P.3d 852, that Petitioners are so authorized.  With respect to the second question, we hold that the July Order's temporary closure of indoor dining was not arbitrary and capricious.

## I.     BACKGROUND

### A.     The COVID-19 Pandemic and Petitioners' Orders

**{2}**     COVID-19, the disease caused by the contagious coronavirus SARS-CoV-2, continues to spread across the United States; as of early February 2021, over 26 million cases of COVID-19 have been diagnosed in the United States, and more than 450,000 Americans have died from the disease.  *See* Centers for Disease Control and Prevention, *U.S. Cases & Deaths.*[2]  New Mexico's share of that case total is 176,211, and 3,355 New Mexicans have died of COVID-19-related causes. *See* N.M. Dep't of Health, *COVID-19 in New Mexico*.[3]  Because there is presently no cure or readily available vaccine for the disease, compliance with social distancing requirements and other precautionary measures remains the only effective means of averting infection. N.M. Dep't of Health, *State of New Mexico COVID-19 Vaccine Allocation Plan* (updated January 28, 2021)[4]; Mayo Clinic, *Coronavirus disease 2019 (COVID-19): Diagnosis & treatment*;[5] U.S. Food and Drug Administration, *COVID-19 Frequently Asked Questions* (updated February 4, 2021).[6]

**{3}**     On March 11, 2020, Governor Michelle Lujan Grisham issued an executive order that a public health emergency exists in New Mexico due to the spread of COVID-19, invoked her powers under the All Hazard Emergency Management Act (AHEMA), NMSA 1978, §§ 12-10-1 to -10 (2007), and declared a public health emergency under the Public Health Emergency Response Act (PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015), pursuant to Section 12-10A-5.  *See* State of N.M.

---

1Available at https://cv.nmhealth.org/wp-content/uploads/2020/07/7.13.20-PHO-1.pdf (last visited Feb. 4, 2021).

2Available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/
cases-in-us.html (last visited Feb. 4, 2021).

3Available at https://cvprovider.nmhealth.org/public-dashboard.html (last visited Feb. 4, 2021).

4Available at https://cv.nmhealth.org/wp-content/uploads/2021/01/2021.1.8-DOH-Phase-Guidance.pdf
(last visited Feb. 4, 2021)

5Available at https://www.mayoclinic.org/diseases-conditions/coronavirus/
diagnosis-treatment/drc-20479976 (last visited Feb. 4, 2021).

6Available at https://www.fda.gov/emergency-preparedness-and-response/
coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions (last visited Feb. 4, 2021).

Executive Order 2020-004 (March 11, 2020) (hereinafter "EO 2020-004").[7]  This executive order was extended through March 5, 2021.  State of N.M. Executive Order 2021-004 (February 5, 2021) (hereinafter "EO 2021-004").[8]

**{4}**     The Secretary of the Department of Health (DOH), Kathyleen Kunkel[9]——citing the Governor's executive orders; the PHERA; the Public Health Act (PHA), NMSA 1978, §§ 24-1-1 to -41 (1973, as amended through 2019); the Department of Health Act (DOH Act), NMSA 1978, §§ 9-7-1 to -18 (1977, as amended through 2019); and "inherent constitutional police powers"——issued a series of emergency public health orders (emergency orders) which, beginning on March 16, 2020, restricted mass gatherings and the operations of certain businesses, requiring some to close entirely. *See* N.M. Dep't of Health, Public Health Order at 3 (March 16, 2020).[10] Indoor and outdoor dining at restaurants was banned effective March 24, 2020.  *See* N.M. Dep't of Health, Public Health Order at 4 (March 23, 2020).[11]  The restrictions imposed in the initial emergency orders were gradually relaxed as New Mexico's daily rate of new infections declined, with outdoor dining permitted at 50% capacity under the fire code as of May 27, 2020 (*see* N.M. Dep't of Health, Public Health Order at 5 (May 27, 2020)[12]), and indoor dining permitted at 50% capacity as of June 1, 2020 (*see* N.M. Dep't of Health, Public Health Order at 5 (June 1, 2020)[13]).

**{5}**     However, in response to a subsequent rise in the rate of new COVID-19 cases in New Mexico and surrounding states, and increasing infections associated with restaurant dining, the Secretary of Health reinstated the ban on indoor dining on July 13, 2020.  *See* July Order, *supra*, at 5*.*  The July Order was amended several times in accordance with changing COVID-19 conditions and, as of early November 2020, the applicable emergency order permitted, among other things, indoor dining at 25% capacity and outdoor dining at 75% capacity.  *See* N.M. Dep't of Health, Public Health Order at 5-6 (October 22, 2020).[14]

**{6}**     The restrictions set out in the July (and follow-up) Order(s) continue to be modified based on changing COVID-19 conditions, albeit now in accordance with a "county-by-county" approach specified in New Mexico's subsequently adopted, three-

7Available at https://www.governor.state.nm.us/wp-content/uploads/ 2020/03/Executive-Order-2020-004.pdf (last visited Feb. 4, 2021).

8Available at https://cv.nmhealth.org/wp-content/uploads/2021/02/ Executive-Order-2021-004.pdf (last visited Feb. 8, 2021).

9Petitioner Kunkel retired from her post as Secretary of Health during the pendency of this proceeding. For the sake of simplicity, we will use the term "Secretary" generically to include her successors, Acting Secretary Billy J. Jimenez and Secretary Designate Tracie C. Collins, M.D.

10Available at https://cv.nmhealth.org/wp-content/uploads/2020/03/031620-DOH-PHO-r.pdf (last visited Feb. 4, 2021)

11Available at https://cv.nmhealth.org/wp-content/uploads/2020/03/ SignedPHO03-24-2019.pdf (last visited Feb. 4, 2021).

12Available at https://cv.nmhealth.org/wp-content/uploads/2020/05/PHO-5-26-2020.pdf (last visited Feb. 4, 2021).

13Available at https://cv.nmhealth.org/wp-content/uploads/2020/06/060120-PHO.pdf (last visited Feb. 4, 2021).

14Available at https://cv.nmhealth.org/wp-content/uploads/2020/10/102220-PHO.pdf (last visited Feb. 4, 2021).

level "reopening" framework. *See* N.M. Dep't of Health, Public Health Order at 6-10 (November 30, 2020).[15] Under this framework, it is anticipated that individual counties—and the businesses operating within their borders—will move from the "Red Level" ("very high risk") to the "Yellow Level" ("high risk') to the "Green Level" ("medium risk") based on demonstrated health metrics bearing on virus spread and test positivity rates, with a corresponding easing of restrictions at each successive stage. *See* N.M. Dep't of Health, *Red to Green Framework.*[16] At present, twenty-five of the thirty-three counties in New Mexico remain at the Red Level and thus are subject to a ban on indoor dining and 25% capacity restrictions on outdoor dining. *See* N.M. Dep't of Health, Public Health Order at 9-11 (January 29, 2021)[17]; N.M. Dep't of Health, *COVID-19 in New Mexico*, supra.

{7}     This Court may, on its own, "judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the court's territorial jurisdiction, [or] (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Rule 11-201(B), (C) NMRA. Therefore, as we did in *Reeb*, 2021-NMSC-006, ¶ 23, we take judicial notice of (1) the serious health risks posed by COVID-19, a "highly contagious and potentially fatal" disease, (2) the disease's transmission within New Mexico, and (3) the emergency orders issued by Governor Grisham and the Secretary. *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1066-67 (D.N.M. 2020) (collecting cases and noting that "[c]ourts presiding over similar cases have taken judicial notice of Public Health Orders and scientific consensus regarding the coronavirus").

## B.     Procedural History

{8}     On July 14, 2020, six food and drink establishments from various locations in the State of New Mexico[18] and the New Mexico Restaurant Association (the Association)—real parties in interest (Real Parties) in this action—filed an application in the Fifth Judicial District Court, seeking a temporary restraining order (TRO) and a preliminary and permanent injunction against Governor Grisham and the Secretary, "prohibiting [them] from enforcing their recently ordered quarantine of all indoor dine-in service spaces for all restaurants and brewery businesses in New Mexico." The application argues that the July Order's indoor dining ban is "[u]ltra [v]ires and [n]ot [e]nforceable" and is "[u]nreasonable, [a]rbitrary, and [c]apricious." The application attaches affidavits from the various businesses and from Carol Wight, CEO of the Association, detailing the loss of income and employment caused by the emergency orders' restrictions on restaurants and, in particular, the prospective consequences of the July Order's ban on indoor dining. The application also attaches an excerpt of Governor Grisham's July 9,

---

[15]Available at https://cv.nmhealth.org/wp-content/uploads/2020/11/113020-PHO.pdf (last visited Feb. 4, 2021).

[16]Available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/red-to-green/ (last visited Feb. 4, 2021).

[17]Available at https://cv.nmhealth.org/wp-content/uploads/2021/01/ GovernorsOffice@state.nm_.us_20210129_161525.pdf (last visited Feb. 4, 2021).

[18]Red River Brewing voluntarily dismissed its case against Governor Grisham and the Secretary on July 16, 2020, so it is no longer a plaintiff in the district court action nor a real party in interest in this action.

2020, press conference and an undated chart apparently published by the DOH (but accompanied by no affidavit or other competent explanation of its source), titled "Coronavirus Risk Levels By Activity," in which churches, gyms, and salons are all categorized as having risks similar to or greater than the risks of indoor dining.

**{9}** On July 15, 2020, Governor Grisham and the Secretary were served with a summons, issued by the district court, notifying them that they had thirty days to file a written response to the Real Parties' application. On July 17, 2020, Governor Grisham and the Secretary entered an appearance and moved for a page limit extension for purposes of responding to the application. Apparently, the district court clerk for presiding Judge Romero indicated to counsel, via email on July 17, 2020, that the request would be granted, but no order was entered until July 21, 2020.

**{10}** Nevertheless, on July 20, 2020, without any notification that the district court intended to issue the TRO prior to receiving a response, the district court did so, finding that Governor Grisham and the Secretary had actual notice of the complaint/application as of July 15, 2020, and had not filed "any responsive pleading . . . as of July 20, 2020 at 11:00 a.m." The district court further found that immediate irreparable injury— namely, "permanent loss of revenue, permanent business closure, and/or bankruptcy"— would result if the TRO did not issue immediately. Accordingly, the TRO restrained Governor Grisham and the Secretary from enforcing the restrictions imposed upon restaurants and breweries in the July Order. The district court further ordered that the Secretary's June 30, 2020, emergency order would remain in force until expiration of the TRO (in ten days), or until issuance of a preliminary injunction.

**{11}** After the district court's entry of the TRO and on the same day, Petitioners filed an emergency petition in this Court for a writ of superintending control and stay of the TRO, asking us to address the two issues identified herein (whether Petitioners had the authority to issue the July Order and whether the July Order is arbitrary and capricious). Attached to the petition are the affidavits of David R. Scrase, M.D., and Robert Genoway, Bureau Chief of New Mexico's Occupational Health and Safety Bureau (within the New Mexico Environment Department, or NMED). This Court immediately granted the stay, setting short deadlines for a response and reply. Petitioners served counsel for the Real Parties a copy of the emergency petition at approximately 2:00 p.m. on July 20, 2020. The Real Parties responded, restating their arguments as set forth in the district court application and contending that this Court should not issue a writ of superintending control because the second issue raised (whether the July Order is arbitrary and capricious) can only be resolved by determining whether the order lacks a rational basis "when viewed in light of the whole record," whereas here, no record has yet been developed. Several Amici Curiae—Eddy County, Jalisco Café, and the Republican Party of New Mexico together with House Minority Leader Jim Townsend and Senate Minority Leader Stuart Ingle—were granted leave to file three separate briefs in support of the Real Parties' arguments. District court Judge Raymond Romero also filed a response to the writ petition, arguing that this Court should not exercise its power of superintending control because Petitioners have sought this remedy "as a means of appealing the entry of the TRO."

**{12}**     On July 22, 2020, the Real Parties filed a motion to lift this Court's stay of the TRO, contending that Petitioners failed to show that irreparable harm would result absent the entry of a stay.  Judge Romero similarly argued that this Court's stay should be lifted and the matter remanded; he volunteered that "[t]o expedite the matter, the District Court would issue a notice, pursuant to Rule 1-066 NMRA, ordering trial of the action on the merits be advanced and consolidated with the hearing on the application for preliminary injunction."  Petitioners responded that this Court properly found that irreparable harm would be caused in the absence of a stay, given the demonstrated link between indoor dining and increased COVID-19 infections in the United States and New Mexico.  On August 12, 2020, we denied the Real Parties' motion to lift our previously issued stay.

**{13}**     Finally, on August 20, 2020, after this matter was scheduled for oral argument on August 26, 2020, the Real Parties filed a motion for leave to supplement the record with the affidavit of biostatistician Hubert A. Allen, Jr., attaching for reference additional documents obtained in connection with recent IPRA requests to the DOH in separate litigation.  Petitioners filed a response in opposition to the motion on August 22, 2020, arguing that the proffered affidavit and referenced documents cannot rebut Petitioners' showing that the temporary closure of indoor dining has a real relation to reducing the spread of COVID-19, which suffices to uphold the lawfulness and constitutionality of the restriction.  We granted the motion, and considered the supplemental affidavit and exhibits.

**{14}**     Following oral argument on August 26, 2020, this Court granted the Petitioners' requested writ, lifting the previously imposed stay, and directing the district court to vacate the TRO and dismiss the Real Parties' application.  This opinion explains the basis for that disposition.

## II.      DISCUSSION

## A.      The Power of Superintending Control

**{15}**     As we recently discussed in *Reeb*, 2021-NMSC-006, ¶ 8, this Court has the power of superintending control over inferior courts.  N.M. Const. art. VI, § 3.  This power enables the Court to control the course of litigation in inferior courts and "to correct any *specie* of error."  *Kerr v. Parsons*, 2016-NMSC-028, ¶ 16, 378 P.3d 1 (citing *Dist. Court of Second Judicial Dist. v. McKenna*, 1994-NMSC-102, ¶ 4, 118 N.M. 402, 881 P.2d 1387); *Albuquerque Gas & Elec. Co. v. Curtis*, 1939-NMSC-024, ¶ 12, 43 N.M. 234, 89 P.2d 615 (explaining that this Court's superintending control "is authorized by the Constitution . . . to prevent a failure of justice by supplying a means for the correction of manifest error committed by the [district] court . . . where there is no other adequate remedy and gross injustice is threatened" (internal quotation marks and citation omitted)).  This Court may make such corrections via extraordinary writs, but it employs them only in exceptional circumstances: "where the remedy by appeal seems wholly inadequate . . . or where otherwise necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship[, or] costly delays and unusual burdens of expense." *McKenna*, 1994-NMSC-102, ¶ 4 (alteration and omission in original) (internal

quotation marks and citation omitted).  We may also exercise the power of superintending control "where it is deemed to be in the public interest to settle the question involved at the earliest moment."  *Griego v. Oliver*, 2014-NMSC-003, ¶¶ 11-14, 316 P.3d 865 (internal quotation marks and citation omitted) (issuing a writ of superintending control on the constitutionality of New Mexico marriage laws, noting, in part, the immediate need to resolve uncertainty regarding the issuance of marriage certificates to same-gender couples); *see McKenna*, 1994-NMSC-102, ¶¶ 4-5.  As Petitioners point out, we have expressly acknowledged the appropriateness of exercising the power of superintending control on an issue of first impression concerning "constitutional provisions with serious public safety implications."  *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 31, 410 P.3d 201.

**1.      Questions presented in the petition**

**{16}**    The Real Parties are correct that "matters entrusted to the [district] court's discretion ordinarily are not matters over which this Court should exercise its jurisdiction to grant extraordinary relief" and that a writ of superintending control "should [not] be used as a substitute for a decision on direct or interlocutory appeal."  *Chappell v. Cosgrove*, 1996-NMSC-020, ¶ 6, 121 N.M. 636, 916 P.2d 836.  But this writ petition centers around questions of constitutional law and statutory construction—matters we review de novo.  *State v. Lucero*, 2007-NMSC-041, ¶ 8, 142 N.M. 102, 163 P.3d 489.  We have also noted that extraordinary writs may be appropriate even if there would be a remedy by appeal, where the public interest implications of the question posed are significant.  *State ex rel. Townsend v. Court of Appeals*, 1967-NMSC-128, ¶ 10, 78 N.M. 71, 428 P.2d 473 (holding that "prohibition will lie even where there is a remedy by appeal, where it is deemed to be in the public interest to settle the question involved at the earliest moment").  Thus, "it is not absolutely essential that the inferior court have an opportunity to pass upon the question involved."  *Id.* ¶ 11 (citing *State ex rel. State Corp. Comm'n v. Zinn*, 1963-NMSC-048, ¶¶ 13-14, 18, 72 N.M. 29, 380 P.2d 182, in which this Court granted a writ of prohibition against the district court prior to the court's hearing on a requested temporary injunction).

**{17}**    The Real Parties have no serious dispute that the first issue presented—namely, whether the Secretary had the legal authority to issue the July Order banning indoor dining in restaurants and breweries—is appropriate for resolution through a writ of superintending control.  Indeed, we have already addressed the issue in *Reeb*, where we concluded that the question of the Secretary's authority under the PHERA was a matter of great public interest warranting immediate resolution through the requested writ.  *See* 2021-NMSC-006, ¶ 9.  However, the Real Parties contend that this Court should decline to issue a writ here, where an evidentiary hearing will ostensibly be required to address the second issue presented: namely, whether the July Order is arbitrary and capricious and/or unconstitutional.  Petitioners reply that the novelty of the legal questions presented and the urgency of those questions as matters of public safety warrant the issuance of the writ, and that the record is sufficient for this Court to decide the question of the July Order's constitutionality.  We agree with Petitioners.  In the context of this case, the record is adequately developed for resolution of the second issue, as further discussed below.

## 2.    The district court's TRO and this Court's stay

**{18}**    We reiterate that this Court's power of superintending control includes the authority to correct any error and control the course of the litigation.  *Kerr*, 2016-NMSC-028, ¶ 16.  Here, the district court's entry of the TRO restraining Petitioners from enforcing the July Order's restrictions was improvidently granted, and therefore our initial stay of the TRO was, in effect, a correction of that intermediate error.  Because the Real Parties and the district court objected to this Court's entry of a stay of the TRO pending resolution of the petition, we address both the issuance of the stay and the lawfulness of the district court's entry of the TRO.

**{19}**    A TRO is a species of injunctive relief, similar to a preliminary injunction but for its expiration after a limited period of time and, under particular circumstances, its issuance without notice to the adverse party.  *Compare* Rule 1-066(B) (governing temporary restraining orders), *with* Rule 1-066(A) (governing preliminary injunctions); *see, e.g.*, *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160 (3d Cir. 2020) (explaining the similarities and differences between TROs and preliminary injunctions). A TRO "is designed to restrain the defendant for a brief period, pending a hearing on an application for a preliminary injunction." 42 Am. Jur. 2d *Injunctions* § 8 (2020).  It is thus an interim measure, intended to preserve the status quo and prevent irreparable harm; it is also "an extraordinary and drastic remedy, which must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain."  *Id.* (footnote omitted).  This is because "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted [to] both sides of a dispute." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).

**{20}**    To obtain a TRO, a movant must therefore show that "(1) the [movant] will suffer irreparable injury unless the injunction is granted; (2) the threatened injury outweighs any damage the injunction might cause the [adversary]; (3) issuance of the injunction will not be adverse to the public's interest; and (4) there is a substantial likelihood [movant] will prevail on the merits."  *See LaBalbo v. Hymes*, 1993-NMCA-010, ¶ 11, 115 N.M. 314, 850 P.2d 1017 (applying the four factors to review the grant of a preliminary injunction); *see, e.g.*, *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2d Cir. 1994) (applying the same four factors to review the grant of a TRO).  Moreover, where injunctive relief is the ultimate relief sought, or where such relief is affirmative—not merely a maintenance of the status quo—the plaintiff "must satisfy a heightened burden" of proof.  *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (characterizing such injunctions as "historically disfavored" and holding that the movant must show "that the four . . . factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issued"(second omission in original) (internal quotation marks and citation omitted)), *aff'd*, 546 U.S. 418 (2006).

**{21}**    Here, arguably, the injunctive relief sought by the Real Parties does not alter the status quo because it seeks a return to the "last peaceable uncontested status" between the parties—namely the state of things under the prior, June 30, 2020, emergency

order, which permitted indoor dining, with certain restrictions.  11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948, Grounds for Granting or Denying a Preliminary Injunction (3d ed. 2013) (observing that some courts "have awarded preliminary injunctions when it is necessary to compel defendant to correct injury already inflicted by defining the status quo as 'the last peaceable uncontested status' existing between the parties before the dispute developed").  We note, however, the difficulty in "determin[ing] what date is appropriate for fixing the status quo." *Id.*  Indeed the United States Supreme Court has suggested that a TRO preventing the implementation of new regulations would alter the status quo.  *Office of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*, 473 U.S. 1301, 1304-05 (1985).  We find this approach compelling here, given that the district court's order enjoined the enforcement of a statewide emergency order that had already become effective.  In any case, it is also clear that the injunction sought by the Real Parties "would supply [them] with all the relief [they] could hope to win from a full trial." *Legacy Church, Inc.*, 472 F. Supp.3d at 1023 (internal quotation marks and citation omitted).  Thus, the district court here was bound to "closely scrutinize" the application "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* (internal quotation marks omitted) (quoting *O Centro Espirita Beneficiente Uniao do Vegetal*, 389 F.3d at 975).

**{22}**     The Real Parties' application plainly fails to withstand heightened scrutiny.  The application alleges, and to some extent supports with affidavits, that the Real Parties will suffer irreparable economic harm as a result of the July Order.  However, it largely fails to address the other required elements—even though it was the Real Parties' burden to show that all four elements weigh heavily and compellingly in their favor.  *O Centro Espirita Beneficiente Uniao do Vegetal*, 389 F.3d at 975 (citation omitted); *Nat'l Tr. for Historic Pres. v. City of Albuquerque*, 1994-NMCA-057, ¶ 18, 117 N.M. 590, 874 P.2d 798 (holding that the "movant for injunction bears [the] burden of persuasion" (citation omitted)).  With respect to the likelihood of success of the merits, we rejected the Real Parties' first argument in *Reeb*, 2021-NMSC-006, ¶¶ 25-46, where we affirmed the enforceability of the emergency orders; we explain in this opinion why their second argument also lacks merit.[19]  Most significantly, the Real Parties also ignore the harms the July Order seeks to prevent—namely, the continued transmission, in a particularly fraught environment, of a potentially life-threatening and communicable disease: COVID-19.  Not only did the application for a TRO lack factual support for the contention that no harm would be posed by enjoining Petitioners' enforcement of the July Order, or that enjoining the July Order was in the public interest, but the district court did not even hear from Petitioners on these issues, in spite of initial indications that it would do so.  Instead, the district court issued a TRO of statewide application, with no findings other than those prescribed by Rule 1-066(B), which requires, we emphasize, findings *additional* to the ordinary requirements for the grant of injunctive

---

[19]In fact, the nature of the Real Parties' underlying claims is somewhat unclear, though we construe the application for injunctive relief to raise the two issues posed in the petition for writ of superintending control.  *See Kaywal, Inc. v. Avangrid Renewables, LLC*, 2021-NMCA-037, ¶ 34, 495 P.3d 550 (noting that injunctive relief is not an independent cause of action "but is only available where the underlying claim is meritorious" (citation omitted)), *cert. denied*, S-1-SC-38096 (Mar. 5, 2020).

relief. Given the improvident granting of the TRO, and the likelihood of irreparable harm posed by hindering Petitioners from implementing an order deemed necessary for the protection of public health, we did not hesitate to stay the district court's TRO during our consideration of the writ petition. *See also* Rule 12-504(D) NMRA.

**B.      Standard of Review and Principles of Statutory Construction**

**{23}**      As noted previously in this opinion, we review questions of constitutional and statutory interpretation de novo. *Lucero*, 2007-NMSC-041, ¶ 8. In construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047; *see In re Portal*, 2002-NMSC-011, ¶ 5, 132 N.M. 171, 45 P.3d 891 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals." (internal quotation marks and citation omitted)). "[I]n determining intent we look to the language used." *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350. We generally give the statutory language its "ordinary and plain meaning unless the [L]egislature indicates a different interpretation is necessary." *Cooper v. Chevron USA, Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61. However, we "will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the [L]egislature." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 20, 117 N.M. 346, 871 P.2d 1352 (internal quotation marks and citation omitted). Thus, where statutory language is "doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction," we construe a statute "according to its obvious spirit or reason," *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064; *Bd. of Educ. for the Carlsbad Mun. Schs. v. State Dep't of Pub. Educ.*, 1999-NMCA-156, ¶ 18, 128 N.M. 398, 993 P.2d 112 (holding that "[a] statute is ambiguous if reasonably informed persons can understand the statute as having two or more meanings" (citations omitted)). In ascertaining a statute's spirit or reason, we consider its history and background, and we read the provisions at issue "in the context of the statute as a whole," including its purposes and consequences. *Baker*, 2013-NMSC-043, ¶ 15; *Key*, 1996-NMSC-038, ¶ 14 ("[A]ll parts of a statute must be read together to ascertain legislative intent[,]" and "[w]e are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole." (citation omitted)).

**C.      Whether the July Order Is Ultra Vires**

**{24}**      Petitioners first ask this Court to address whether the July Order was unlawfully issued. The Real Parties argue that the July Order goes beyond the powers granted by the Legislature (violating separation of powers principles) and usurps the procedural requirements—including judicial review—attendant to quarantine orders. They further contend that the July Order effectively quarantines restaurants by banning indoor dining. They conclude that the Secretary failed to comply with the requirements for obtaining quarantine orders and thus had no power to issue the July Order, rendering it void. These arguments have been squarely considered and rejected. *See Reeb*, 2021-NMSC-006, ¶¶ 25-46.

**{25}** Amici, New Mexico Republican Party, et al., however, raise new arguments—primarily developing the more limited argument in *Reeb*, *id.* ¶ 30, that the Secretary had no power to issue the business restrictions/closures through an order, rather than through rulemaking procedures. Specifically, Eddy County argues that the Secretary was required to comply with the State Rules Act, NMSA 1978, §§ 14-4-1 to -11 (1967, as amended through 2017), which directs agencies, including the DOH, to promulgate rules via the rulemaking procedures set forth therein. Eddy County further argues that the emergency and public health legislation at issue likewise does not permit the Governor to "create or change substantive law" through orders such as the July Order's business closure mandate and that it would be an unconstitutional exercise of the powers reserved to the Legislature for her to issue such orders. Amici, New Mexico Republican Party, et al., also advance this argument, contending that this Court should, under nondelegation principles, declare an "end date" on Petitioners' powers to issue emergency orders, so that the Legislature may assume its proper lawmaking/policymaking role to address the COVID-19 pandemic.

**{26}** On the first point, Eddy County contends that, because the PHA's provision permitting the DOH to "close any public place and forbid gatherings of people when necessary for the protection of the public health," § 24-1-3(E), is "non-self-executing," the Legislature intended further rulemaking (authorized repeatedly throughout the PHA, *see* § 24-1-3(M), (Q), (R), (S), and the PHERA, § 12-10A-17) to carry out that grant of authority. Furthermore, Eddy County asserts, the Secretary's authorization in Section 9-7-6(B)(5) to issue "orders and instructions, not inconsistent with the law," can only apply to provisions granting the Secretary "self-executing" authority—which Section 24-1-3(E) does not do. Eddy County cites *Jaramillo v. City of Albuquerque*, 1958-NMSC-107, ¶¶ 8, 14, 64 N.M. 427, 329 P.2d 626, for the proposition that "a self-executing provision is one which supplies the rule or means by which the right given may be enforced or protected or by which a duty enjoined may be performed," whereas non-self-executing provisions merely declare a "principle or policy" which requires legislation or rulemaking activity for its implementation. *Id.* (internal quotation marks and citation omitted). Amici, New Mexico Republican Party, et al. similarly argue that Section 24-1-3(E) arises in a general declaration of the powers of the DOH and should be read as requiring additional legislation to operationalize the powers conveyed—otherwise, such powers would be impermissibly broad and standardless.

**{27}** While we agree that Section 24-1-3(E) of the PHA does not expressly supply the means by which public places should be closed, or gatherings prohibited, we are not convinced that the provision is "non-self-executing." The authorizing language implies execution through an order that may be deployed when necessary to protect public health. *See Wisconsin Legislature v. Palm*, 2020 WI 42, ¶ 147, 942 N.W.2d 900 (Dallet, J., dissenting) (noting that, although a similar provision in Wisconsin's public health law "does not specify the method by which [the Department of Health Services] can close schools and forbid public gatherings, th[e] subsection clearly envisions the issuance of orders" as the means for its execution). Other provisions in the PHA authorize rulemaking "for the control of conditions of public health importance," implying that the closure of public places and prohibition on gatherings is a separate, additional power. Section 24-1-3(Q); s*ee State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1

("[A] statute must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)); *Key*, 1996-NMSC-038, ¶ 14 ("[A]ll parts of a statute must be read together to ascertain legislative intent.")). And, while the Legislature enacted further statutory provisions operationalizing certain powers (such as isolation and quarantine, generally described in Section 24-1-3(D) and made operational in Section 24-1-15), it declined to do so with respect to closing public places and forbidding gatherings to protect public health, presumably because the issuance of an order was indeed the contemplated method of implementation.

{28}   Eddy County is correct that the State Rules Act, as a general matter, requires executive bodies like the DOH to utilize rulemaking procedures (such as a public hearing, preceded by notice and a comment period). *See* §§ 14-4-2(A), -3 to -11. The State Rules Act defines a rule, subject to rulemaking requirements, as any

> rule, regulation, or standard, including those that explicitly or implicitly implement or interpret a federal or state legal mandate or other applicable law and amendments thereto or repeals and renewals thereof, issued or promulgated by any agency and purporting to affect one or more agencies besides the agency issuing the rule or to affect persons not members or employees of the issuing agency[.]

Section 14-4-2(F). As to the nature of an administrative rule generally, this Court has also held that a rule is "a statement asserting a standard of conduct which has the force of law; it affects the rights or obligations of those who fall within its ambit." *Livingston v. Ewing*, 1982-NMSC-110, ¶¶ 1-2, 9, 98 N.M. 685, 652 P.2d 235 (holding that the Museum of New Mexico's resolution limiting the space inside the Santa Fe Plaza's portal to Native American artisans was "a rule for the purposes of its promulgation").

{29}   The July Order arguably meets these criteria. It implements the PHA and the PHERA, and it purports to have the force of law and to affect the rights and obligations of all New Mexicans. However, the Legislature may create exceptions to the applicability of rulemaking requirements—even for provisions that arguably meet the definition of a rule in certain respects. It seems the Legislature did just that with respect to the Secretary's power to close public places and restrict gatherings. As we have already discussed, this power is in addition to rule-making powers under the statute. Section 9-7-6(B)(5), (E). The DOH Act also references the State Rules Act in connection with the Secretary's authority to adopt procedural rules, and *not* in connection with her authority to issue orders and instructions. *Id.*

{30}   Such a delegation of substantial discretion and authority to the executive branch (including state or local health boards) to respond to health emergencies has a long history in the United States. *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 27 (1905) (holding that the Massachusetts legislature was permitted to entrust to local boards of health the decision whether to require the inhabitants of a city or town to be vaccinated against small pox as "necessary for the public health or the public safety," noting that "surely it was appropriate for the legislature to refer" such a question to the local boards, appointed "presumably, because of their fitness to determine such

questions"); *Palm*, 2020 WI 42, ¶ 136 (Dallet, J., dissenting) (noting that the Wisconsin Supreme Court recognized in 1904 the legislature's rightful "grant to boards of health authority to . . . act immediately and summarily in cases of . . . contagious and malignant diseases, which are liable to spread and become epidemic, causing destruction of human life" (second omission in original) (internal quotation marks and citation omitted)); *State v. Schreckengost*, 30 Ohio St. 2d 30, 32-33, 282 N.E.2d 50 (1972) (holding that, when the discretion to be exercised by an executive officer or board "relates to a police regulation for the protection of the public morals, health, safety, or general welfare, and it is impossible or impracticable to provide [strict] standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations" (internal quotation marks and citation omitted)).  As our Court of Appeals stated in *Old Abe Co. v. New Mexico Mining Commission*, 1995-NMCA-134, ¶ 27, 121 N.M. 83, 908 P.2d 776, "some situations require the vesting of some discretion in public officials, as, for instance, where . . . the discretion relates to the administration of a police regulation and is necessary to protect the public morals, health, safety, and general welfare" (internal quotation marks and citation omitted).  Indeed, "[a]gencies and individuals with important responsibilities must have *considerable* discretion in order to fulfill their responsibilities effectively.  Inadequate discretion probably is a larger problem than excessive discretion."  *Id.* ¶¶ 28-29 (emphasis added) (internal quotation marks and citation omitted) (holding that the regulations at issue were not an unconstitutional delegation of discretion to a division director in the New Mexico Energy, Minerals and Natural Resources Department to implement environmental safety standards).  In harmony with these observations, courts have liberally construed grants of authority to public health agencies.  *See Reeb*, 2021-NMSC-006, ¶ 27.

**{31}**    The notion that the Legislature did not intend to grant the Secretary of Health discretion to implement Section 24-1-3(E) through orders is inconsistent with the foregoing holdings and the underlying principles recognizing both the necessity and constitutionality of orders exercised in the discretion of executive officials charged with managing public health crises.  Nor would the process or purpose of rulemaking be a fitting tool for an executive agency managing a pandemic.  Even emergency rulemaking, which initially obviates time-consuming procedures such as a public hearing and a period for notice and comment, does not "share the limited nature of an order," *Palm*, 2020 WI 42, ¶ 153 (Dallet, J., dissenting), but is intended to be an interim measure pending promulgation of the permanent rule.  *See* § 14-4-5.6(E) ("An emergency rule shall remain in effect until a permanent rule takes effect under the normal rulemaking process.").  Furthermore, detailed public findings must be entered with respect to each emergency rule, and "[i]f no permanent rule is adopted within one hundred eighty days from the effective date of the emergency rule, the emergency rule shall expire *and may not be readopted as an emergency rule*."  Section 14-4-5.6(B), (E) (emphasis added).

**{32}**    The Secretary has to date issued amended or supplemental emergency orders some thirty-seven times over a ten-month period, as might be expected in response to the swiftly changing dynamics of a novel, dangerous, and highly communicable disease.

New Mexico is still in a state of emergency due to widespread community transmission of COVID-19. *See* EO 2021-004, *supra*. But under the argument of Amici, the Secretary would have had to promulgate permanent rules by mid-September 2020 or else lose entirely the ability to implement emergency regulations to address the COVID-19 pandemic. Interpreting the law to restrict the Secretary of Health in this manner would surely defeat the purposes of the PHA and the PHERA.

**{33}** Furthermore, while the July Order may have some qualities meeting the definition of a rule, its function is in many ways more similar to that of an executive order. As noted by a dissenting justice on the Wisconsin Supreme Court (which addressed this very same argument in the context of an emergency order issued in response to the COVID-19 pandemic), a "rule applies to future circumstances and is enacted with the purpose of guiding future conduct. [An emergency order] is an immediate response to current circumstances and has an end-date. . . . It does not serve as guidance for response to any future unique contagious disease, or even to the evolving circumstances surrounding COVID-19." *Palm*, 2020 WI 42, ¶ 153 (Dallet, J., dissenting). In other words, emergency orders do not create a standard so much as a series of temporary requirements to meet a crisis. These observations are true of the July Order here—one of many emergency orders issued since March 13, 2020, all of which have been *pursuant to Governor Grisham's order* that the Secretary of Health respond to the COVID-19 crisis. *See* EO 2020-004, *supra*, ¶ 3, (directing the DOH and the Department of Homeland Security and Emergency Management to "collaborate to provide an effective and coordinated response to this public health emergency" and to "consult with [the Governor's] office regarding all matters germane to this order"). The July Order is thus the reflection of a collaboration among executive officials, including the Governor, to respond to the COVID-19 pandemic, as contemplated under the PHERA. Sections 12-10A-3(C), -5(A).[20]

**{34}** This is the answer to the Amici's argument that the Governor and DOH have "seized legislative authority on a massive scale—authority which the constitution vests exclusively in the [l]egislative [b]ranch." "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed

---

[20]Amici argue that the Governor is "specifically limit[ed]" in her powers to respond to a public health emergency; namely, she may only utilize the PHERA's emergency declaration, "[s]pecial powers," and quarantine provisions (§§ 12-10A-6 to -11). We have already held that these powers are not limiting or exclusive but are in *addition* to the existing powers of the Governor and others to respond to a public health emergency. *Reeb*, 2021-NMSC-006, ¶¶ 25-30. For instance, the AHEMA empowers the Governor to direct and control the State of New Mexico's response to "any man-made or natural disaster causing or threatening widespread physical or economic harm that is beyond local control and requiring the resources of the state." Section 12-10-4(A). Its purpose is, in part, to "provide an emergency operations plan for the protection of life and property adequate to cope with disasters resulting from . . . natural or man-made causes other than acts of war." Section 12-10-2(B), (C). The Governor may "issue, amend or rescind the necessary orders, rules and procedures to carry out the provisions of the [AHEMA.]" Section 12-10-4(B)(2). Neither the Amici nor the Real Parties raise any argument that the COVID-19 pandemic is not a natural disaster within the meaning of the AHEMA. *Cf. Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) (interpreting a statute analogous to the AHEMA and concluding that the "COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions"), *cert. denied*, 141 S.Ct. 239 (2020).

powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (describing the balance of powers among the branches of the federal government); *see also Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell*, 1994-NMSC-096, ¶¶ 42-43, 118 N.M. 470, 882 P.2d 511 (observing that New Mexico's separation of powers into a tripartite government mirrors the federal structure, and emphasizing that the roles and powers of the respective branches are separate but overlapping). The operative question is whether the July Order "disrupts the proper balance between the executive and legislative branches" and infringes on the legislative branch by, for instance, imposing through executive order substantive policy changes in an area of law reserved to the Legislature. *State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶¶ 24-25, 125 N.M. 343, 961 P.2d 768 (internal quotation marks and citation omitted) (holding that the Governor's executive order "substantially altered, modified, and extended existing law governing the structure and provision of public assistance in New Mexico" and was therefore unconstitutional). For the reasons discussed herein, we conclude that the July Order does not work a fundamental disruption of the balance of powers between the branches of government in the context of this public health crisis. New Mexico has not entered a "new normal," nor do the temporary emergency orders constitute "long-term policy" decisions. New Mexico remains in a state of emergency. *See* EO 2021-004, *supra*. The argument that special sessions of the Legislature should be used in lieu of Petitioners' emergency orders is so facially unworkable that it only reinforces the conclusion that it was appropriate for the Legislature to grant the executive branch ample authority to immediately and flexibly respond to a public health emergency.[21]

**{35}** For all the foregoing reasons, we decline to alter *Reeb*'s conclusion that Petitioners are empowered under the PHERA and the PHA to issue business restrictions such as the indoor dining ban at issue in the July Order.

## D.     Whether the July Order Is Arbitrary and Capricious

**{36}** The second issue raised is whether the July Order is arbitrary and capricious. The Real Parties apparently seek a declaration to this effect under the law applicable to judicial review of administrative actions and under the law applicable to constitutional due process/equal protection claims—both of which prohibit arbitrariness in agency decision-making. *Cf., e.g.*, *Old Abe Co.*, 1995-NMCA-134, ¶¶ 10, 44-45 (reviewing mining regulations under the applicable judicial review statute and stating that "[a]rbitrary and capricious [agency] action has been defined as willful and unreasoning action, without consideration and in disregard of facts and circumstances"; holding, as to the plaintiff's equal protection claim, that while "[t]he State retains the power to classify and draw lines that treat different classes of persons differently[, it] may not . . . exercise its power to classify arbitrarily" (first internal quotation marks and citation omitted; then citation omitted)). The Real Parties would have the Court ask whether the

---

[21]Nor does the Governor have "unilateral authority" to call a special or extraordinary session of the Legislature. Article IV, Section 6 of the New Mexico Constitution empowers the Legislature to convene an extraordinary session where three-fifths of the Legislature deem such session necessary due to an emergency.

ban on indoor dining is the "least restrictive means" to prevent the transmission of COVID-19; whether there is adequate justification for singling out indoor dining for greater restrictions; and whether the July Order was the rational product of an administrative "winnowing and sifting process" (internal quotation marks and citation omitted). They further assert that, because this inquiry is fact-dependent and requires review of the whole record, this Court should remand the matter to the district court for an evidentiary hearing. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806 (holding that "[a] ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record").

{37}   Petitioners respond that whole record review is inapplicable here, where the July Order was not the result of rulemaking or adjudication; they further assert that the Real Parties have failed to make a prima facie case that Petitioners have acted arbitrarily. They highlight that the "room" for differing opinions and the deference given to state agencies is especially broad in the context of a health crisis, citing *Old Abe Co.*, 1995-NMCA-134, ¶ 10, *State ex rel. Hughes v. Cleveland*, 1943-NMSC-029, ¶ 18, 47 N.M. 230, 141 P.2d 192, and *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614, (2020) (mem.) (Roberts, C.J., concurring) ("The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement."). Referencing the increased risk of COVID-19 transmission associated with indoor dining—both generally and in New Mexico—Petitioners argue that the policy choice to enact a temporary statewide ban on indoor dining is reasonable, even if it is not the *only* available policy choice. They assert that the Court should therefore grant the requested writ because any showing by the Real Parties of "contrasting views as to the best means for addressing the COVID-19 pandemic" would be immaterial.

{38}   First, because we have concluded that it was within the Secretary of Health's statutory authority to issue the July Order, it is the Real Parties' burden to show that the July Order is arbitrary and capricious. *See Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 9, 120 N.M. 579, 904 P.2d 28 (holding that the party challenging a commission decision bears the burden of showing that the decision is unreasonable). Furthermore, as we have discussed previously in this opinion, the typical rulemaking or adjudicatory process (entailing entering findings or formally considering various opinions) was not the process for the making of the July Order, an emergency provision in the nature of an executive order responding to *immediate* conditions. Thus, while it is true that all agency action "must conform to some statutory standard or intelligible principle," *Rivas v. Bd. of Cosmetologists*, 1984-NMSC-076, ¶ 3, 101 N.M. 592, 686 P.2d 934 (citations omitted), in this case, that principle conveys flexibility, discretion, and prompt action: the closure of public places or prohibition of gatherings when necessary "for the protection of public health." Section 24-1-3(E). We heed our precedent's admonishments to "uphold regulations intended to protect the public health, unless it is plain that they have no real relation to the object for which ostensibly they were enacted," *Cleveland*, 1943-NMSC-029, ¶ 18 (internal quotation marks and citation omitted), and to bear in mind that "[w]here there is room for two opinions, [the] action is not arbitrary and capricious even though one may believe an

erroneous conclusion has been reached," *Old Abe Co.*, 1995-NMCA-134, ¶ 10 (second alteration in original) (internal quotation marks and citation omitted).

**{39}**    The foregoing administrative review standards are consistent with the deferential standard of constitutional review applicable to laws or executive orders issued for the protection of public health during a public health crisis.  Rational basis review, typically applicable where (as here) the claimant has not identified an allegedly arbitrary classification as impairing a fundamental right or affecting a suspect class, requires a classification to be upheld unless it "is so devoid of reason to support it, as to amount to mere caprice." *Bd. of Trustees of Town of Las Vegas v. Montano*, 1971-NMSC-025, ¶ 14, 82 N.M. 340, 481 P.2d 702; *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (noting that "the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a bare . . . desire to harm a politically unpopular group" or were "divorced from any factual context from which we could discern a relationship to legitimate state interests") (omission in original) (internal quotation marks and citation omitted).[22]

**{40}**    The United States Supreme Court has also given deferential review to Fourteenth Amendment claims regarding state action for the protection of public health, asking whether the action has a "real or substantial relation to th[e] objects" of the legislation or whether it is instead, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. Undoubtedly, given that *Jacobson* was decided well before the development of modern American constitutional jurisprudence, some would give its holding a narrow application.  *See, e.g.*, *Calvary Chapel Dayton Valley v. Sisolak*, ___ U.S. ___, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting) (opposing the denial of injunctive relief; deeming it "a considerable stretch to read the [*Jacobson*] decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case").  However, *Jacobson* is still good law, as reflected by the heavy reliance placed on its deferential review standard by many courts addressing challenges to state restrictions imposed during the COVID-19 pandemic.  *See In re Abbott*, 954 F.3d 772, 783-86 (5th Cir. 2020) (characterizing the *Jacobson* rule as the "framework governing emergency exercises of state authority during a public health crisis [for] over a 100 years[,]" under which "*all* constitutional rights may be reasonably restricted to combat a public health emergency"), *cert.*

---

22Amicus Jalisco Café argues that this Court should apply intermediate or strict scrutiny because the July Order as a whole infringes upon fundamental rights (such as the right to travel, and the right to freedom of assembly), or because it infringes upon the "occupational freedom" to run a business—a freedom this Court should hold is fundamental.  First, we decline to adopt a standard of review unrelated to the claims raised by the Real Parties, which focus only on the July Order's indoor dining prohibition.  Second, the law restricts occupational freedom in myriad ways, for instance, by imposing licensing requirements and permit and regulatory requirements.  Noticeably, Jalisco Café cites no cases applying heightened scrutiny to such restrictions merely on the basis of an infringement upon occupational freedom; we therefore assume that no such authority exists.  *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that we may assume no authority exists for an argument where a party does not provide any).  We decline to apply heightened scrutiny absent persuasive authority that such scrutiny is warranted.

*granted*, *judgment vacated on other grounds sub nom. Planned Parenthood v. Abbott*, ___ S. Ct. ___, No. 20-305, 2021 WL 231539 (Jan. 25, 2021); *Elkhorn Baptist Church v. Brown*, 466 P.3d 30, 34-35, 42-44 (Or. 2020) (relying extensively on *Jacobson* in upholding Oregon's COVID-19 executive orders); *see also M. Rae, Inc. v. Wolf*, ___F. Supp. 3d ___, Civil Action No. 1:20-CV-2366, 2020 WL 7642596, at 6 (M.D. Pa., Dec. 23, 2020) (recognizing "that *Jacobson* is controlling precedent until the Supreme Court . . . tell[s] us otherwise").[23]

**{41}** Here, in support of the July Order's real or substantial relation to a public health concern, Petitioners have submitted an affidavit from Dr. Scrase, a medical doctor serving as the Cabinet Secretary for the New Mexico Human Services Department, who has assisted with public policy determinations related to the State's response to COVID-19. Dr. Scrase describes the multidisciplinary data gathered and considered by the Secretary and the Governor in determining restrictions on businesses and gatherings, and he affirms having significant involvement in this process. He then explains the growing scientific understanding that indoor dining presents a particularly risky setting for transmission of the COVID-19 virus, given that indoor dining entails patrons sitting for prolonged periods without masks, and given the known transmission of the virus via droplets expelled when speaking (or even breathing). Petitioners have also submitted the affidavit of Mr. Genoway, of the NMED, who heads New Mexico's "rapid response" effort—the process of immediately advising and assisting employers of individuals who have tested positive for COVID-19. Mr. Genoway avers that his department collects data and sorts those who have tested positive for COVID-19 by industry and subindustry. Charts within Mr. Genoway's affidavit indicate that instances of COVID-19 cases among restaurant staff increased significantly beginning approximately two weeks after the resumption of indoor dining on June 1, 2020, and formed an increasing share of the overall rapid responses to employers (from approximately 9% of rapid responses on June 15, 2020, to approximately 15% of rapid responses by July 12, 2020).

**{42}** The Real Parties, in support of their argument, submit the affidavit of a biostatistician, Hubert A. Allen, Jr., who argues that the temporary closure of indoor dining has not been an effective strategy to prevent the transmission of COVID-19. For instance, he contends that the prohibition did not result in decreased rapid response calls to New Mexico restaurants over the five weeks following its initiation. He also notes that no detailed contact tracing data is apparently available, rendering it unclear whether any given restaurant employee contracted COVID-19 while in the workplace. Apart from Mr. Allen's affidavit, the Real Parties question the justification for various aspects of the indoor dining ban, including the use of the fire code to assess occupancy restrictions; the harsh economic impact of the restrictions; the requirement that patrons be seated at a table limited to six people; and permitting gyms to operate in an indoor setting at 25% capacity.

---

[23]We emphasize that this case does not require us to decide *Jacobson's* outer limits. The Real Parties' arguments are precisely those raised in *Jacobson*—that the public health order is arbitrary and unreasonable. Therefore, *Jacobson's* holding is directly on point. Moreover, as we have just discussed, only rational basis scrutiny would apply to the Real Parties' claims regardless of *Jacobson's* holding.

**{43}** But the question is whether the temporary closure of indoor dining is arbitrary or pretextual or lacks a real or substantial relation to the object of preventing community transmission of COVID-19. We could not answer "yes" to this question even if the Real Parties demonstrated that the closure measure had not been a success. Neither the Real Parties' nor Eddy County's criticisms nor the alleged overbreadth of the prohibition, even if further developed at an evidentiary hearing, would show that the prohibition is arbitrary or pretextual. The unique risks of indoor dining, described by Dr. Scrase in his affidavit, and the increased COVID-19 cases among New Mexico restaurant staff during the time period when indoor dining restrictions were relaxed show a real and substantial relation between the July Order's temporary prohibition and the object of controlling and suppressing the spread of COVID-19. *See Jacobson*, 197 U.S. at 31; *Cleveland*, 1943-NMSC-029, ¶ 18. This Court may not second-guess the wisdom or efficacy of the July Order merely because reasonable minds may differ about the best approach to suppressing community transmission of COVID-19. *Jacobson*, 197 U.S. at 30; *see also Old Abe Co.*, 1995-NMCA-134, ¶ 10; *See Legacy Church, Inc.*, 472 Fed. Supp. 3d at 1083 (holding that the court could not "say that the June 30 Order's differential treatment of restaurants, gyms, and religious gathering has no real or substantial relation to protecting public health").

**{44}** In all, we conclude that the July Order's temporary closure of indoor dining is neither arbitrary nor capricious.

## III. CONCLUSION

**{45}** For the foregoing reasons, we have granted a writ of superintending control vacating our previously issued stay and ordering the district court to vacate the TRO and dismiss the Real Parties' application.

**{46} IT IS SO ORDERED.**

**JUDITH K. NAKAMURA, Justice,**
**Retired, Sitting by designation**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice (specially concurring)**

**THOMSON, Justice (specially concurring).**

**{47}** "A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." *Block v. Hirsh*, 256 U.S. 135, 157 (1921) (J. Holmes). This dispute and the other cases regarding the executive's emergency public health orders require this Court to confront the government's authority to act in

response to a crisis. These cases reveal important questions surrounding separation of powers, lawful delegation of authority, and the judiciary's role in ensuring against encroachments upon constitutional guarantees by the co-equal branches of government. This complex and evolving analysis is not put entirely to rest by the majority opinion.

{48}    I join the majority on the facts of this case because I agree that the actions taken in this matter were a proper exercise of executive emergency authority to address a clearly identifiable public health crisis. However, we must be cautious in our acknowledgement of the executive's authority to act in all circumstances during an emergency, as history and current events reveal. It is my belief that "robust judicial review" of the validity of the exercise of executive police or emergency power "not only helps to smoke out pretext for government actions during an emergency, but also has value for the government — which can use the case law its policies generate to help define the boundaries of its future approaches." Lindsay F. Wiley & Stephen I. Vladeck, *Coronavirus, Civil Liberties, and the Courts: The Case Against "Suspending" Judicial Review*, 133 Harv. L. Rev. F. 179, 195 (2020).

{49}    I therefore write separately to express my concern that the broad and vague statutes that grant emergency powers to the Governor combined with the deference given to the executive to act in times of emergency may pose potential long-term consequences to our system of checks and balances. While I entirely endorse the conclusion the majority reaches in this case, I respectfully disagree that "New Mexico has not entered a 'new normal.'" *Maj. op.* ¶ 34.  The majority's holding should not communicate that executive or legislative responses to the pandemic will always receive the same level of judicial deference as when the crisis first emerged.  In addition, I believe we must be wary of the precedent we set beyond the scope of the COVID-19 crisis. The executive must be allowed to act with some flexibly in times of true emergency and the means to address it. However, this does not relieve the executive of its obligation to show, subject to scrutiny and verification, that the stated emergency and the means to address it are reasonable.

{50}    Perspective is important here. The courts in a wide variety of constitutional contexts have found government concerns about "safety and . . . the lives of its citizens" enough to justify restrictions on individual liberties. *United States v. Salerno*, 481 U.S. 739, 748, 755 (1987) ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest."). Outside of the exigencies of a crisis, such restrictions have been upheld in constitutional challenges for interests arguably greater than those expressed in this case. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (explaining that "constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"); *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("[W]hether [a code] governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, [it] inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for

political ends."); *State v. Widmer*, 2020-NMSC-007, ¶ 1, 461 P.3d 881 (affirming the ruling of the district court "that the *Quarels* public safety exception applied . . . because of the need to determine whether Defendant was armed or carrying potentially harmful drug paraphernalia before officers performed a pat-down search"). With that in mind, what is cause for concern? Disputes over public health orders expose concerns that the executive's expansive emergency authority to enact restrictions on its citizens is tethered only to its subjective belief that its actions are reasonable. *See maj. op.* ¶ 43 ("This Court may not second-guess the wisdom or efficacy of the July Order merely because reasonable minds may differ about the best approach to suppressing community transmission of COVID-19.").

**{51}**    As this opinion and previous opinions describe, the cobbling of statutes grants broad authority for an executive to act under "emergency" or "inherent" authority. *See maj. op.* ¶ 30; *see also Reeb,* 2020-NMSC-__, ¶¶ 14, 15, 29 (reasoning that the executive "may deploy both the special powers contained in the PHERA and the general powers of [the] office in response to a public health emergency," and "enforce and administer New Mexico's legislation concerning public health emergencies under what are best described as concurrent and complementary statutes"). However, "[l]oose and irresponsible use of adjectives colors all non-legal and much legal discussion of presidential powers. 'Inherent' powers, 'implied' powers, 'incidental' powers, 'plenary' powers, 'war' powers and 'emergency' powers are used, often interchangeably and without fixed or ascertainable meanings." *Youngstown*, 343 U.S. at 646–47 (Jackson, J. concurring). Such is true in these cases where the meaning of the adjectives "plenary" and "emergency" used to justify an executive's response must become more ascertainable as a crisis continues.

**{52}**    When a crisis first erupts, the question of whether the executive branch has exercised its police or emergency powers within the structures of the Constitution can be indeterminate and at times vague. This is understandable because the need to immediately address a life-threatening situation does not necessarily allow for a full, open debate concerning all of the possibilities to arrive at a *best* and clearly constitutional response. At some point, however, as the crisis continues, the judiciary's deference to the executive's reasoning and rationale wanes. In his concurrence in *Youngstown*, Justice Jackson stated, "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a *zone of twilight* in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637 (emphasis added) (noting that presidential powers "are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress").

**{53}**    There may reach a point at which the state of emergency is no longer an immediate crisis but a managed and regulated one, because either the circumstances have changed, and the crisis has ended, or life has settled into a *new normal,* and what was once a crisis is now an everyday reality of life. Extending Justice Jackson's analysis concerning the semi-permeable boundary between the proper exercise of federal executive and legislative power, the exercise of state executive power during a crisis or emergency may likewise fall within a zone of twilight, where the power to act is

not the sole province of one branch of government. *See, e.g.*, *Reeb*, 2021-NMSC-006, ¶ 1 (addressing the question of whether an executive action taken was authorized by a legislative delegation of power pursuant to Section 12-10A-19 of the PHERA). As the crisis continues, the boundary between the executive, legislative, and judicial branches becomes, in Justice Jackson's words, "semi-permeable."

**{54}** In my view, once a situation has moved beyond the status of an immediate crisis, it is not enough for the executive to justify broad emergency authority based only on subjective rationale. This does not mean the power to act is diminished; it simply means the power to act without justifiable rationale wanes. At this point, the Legislature may choose to assert its role. *See, e.g.*, H.B. 10, 54th Leg., 1st Spec. Sess. (N.M. 2020) (attempting with Section 1(A) to limit the invocation pursuant to an act in the Emergency Powers Code to 30 days "unless extended by joint resolution of the legislature"). In addition, there may be an increased need for judicial review of the executive's declared emergency, declared means to end the emergency, and the basis for both as it relates to the end. Justice Cardozo stated in *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*:

> From the standpoint of due process—the protection of the individual against arbitrary action—a deeper vice is this, that even now we do not know the particular or evidential facts of which the Commission took judicial notice and on which it rested its conclusion. Not only are the facts unknown; there is no way to find them out. When price lists or trade journals or even government reports are put in evidence upon a trial, the party against whom they are offered may see the evidence or hear it and parry its effect. Even if they are copied in the findings without preliminary proof, there is at least an opportunity in connection with a judicial review of the decision to challenge the deductions made from them.

301 U.S. 292, 302–03 (1937). During a longer-term crisis, the ability of the public to know and parry the facts upon which the executive acts strengthens rather than weakens our constitutional structure.

**{55}** Although courts may defer to the executive when reviewing an executive action taken during a public health crisis—the most deferential review being exemplified by *Jacobson*[24]—this review recognizes that there is, in fact, an emergency. *See* 197 U.S.

---

[24]In my view *Jacobson* is unfairly maligned. It was decided prior to the enactment of the tiered system of analyzing government restrictions, a system that perhaps itself is not suited for examination of a public health crisis. In fact, *Jacobson* provides excellent guidance to this country facing a public health crisis emerging nearly 105 years after its writing. Concerning an emerging trend in this crisis that posits personal liberty as justification to not wear a mask despite its proven effectiveness to prevent the transmission of COVID-19 to others, *Jacobson* instructs:

> There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others.

at 12. Intrinsic to the judiciary's consideration of this question is whether the crisis or emergency upon which the executive bases its exercise of police power is legitimate and whether the executive action is reasonably related[25] to the response to the asserted crisis or emergency. *See Mitchell v. City of Roswell*, 1941-NMSC-007, ¶ 13, 45 N.M. 92, 111 P.2d 41 ("It is the policy of the courts to uphold regulations intended to protect the public health, unless it is plain that they have no real relation to the object for which ostensibly they were enacted, and prima facie they are reasonable."); *cf. Jacobson*, 197 U.S. at 31 (describing judicial review of legislative action, rather than executive action "[i]f there is any such power in the judiciary to review legislative action . . . affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health . . . or the public safety, has no real or substantial relation to those objects"). Respectfully, the Legislature has created a statutory system with a closed loop of authority to regulate liberties and the fact finding to support those regulations in times of emergency. The executive describes the emergency, creates the means to address it, and justifies that means in the same order that grants it the authority in the first place.

{56}   Although the evidence before the Court in this case sufficiently establishes that there is a state of emergency that justifies the executive actions taken up to this point, with an eye toward the future, this Court must balance review of the executive's justification for exercising its authority with the need for the executive to respond effectively to an emergency.

**DAVID K. THOMSON, Justice**

---

197 U.S. at 26.

25However, where there are "plain, palpable invasion of rights secured by the fundamental law" such as a violation of a constitutionally protected right or discrimination based on a suspect class, courts must apply the applicable level of scrutiny. Jacobson, 197 U.S. at 31; see also Roman Catholic Diocese of Brooklyn v. Cuomo, ___U.S.___, ___, 141 S. Ct. 63, 70 (2020) (Gorsuch, J. concurring) (noting the Jacobson Court "essentially applied rational basis review").