The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:_____

Filing Date: April 1, 2025

**No. A-1-CA-40852**

**NEW MEXICO FAMILIES FORWARD,**

    Petitioner-Appellee,

v.

**NEW MEXICO STATE ETHICS COMMISSION,**

    Respondent-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Daniel E. Ramczyk, District Court Judge**

Sara Berger Law
Sara Berger
Portland, OR

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Linda M. Vanzi
Albuquerque, NM

for Appellee

State Ethics Commission
Jeremy Farris
Walker Boyd
Albuquerque, NM

for Appellant

Office of Secretary of State
Peter S. Auh, General Counsel
Santa Fe, NM

for Amicus Curiae

**OPINION**

**YOHALEM, Judge.**

{1}     The New Mexico State Ethics Commission (the Commission) appeals the district court's grant of a writ of mandamus ordering the Commission to "cease all proceedings" and "dismiss the action against [New Mexico Families Forward (NMFF)] for lack of jurisdiction." We conclude that the district court did not abuse its discretion in refusing to require NMFF to exhaust administrative remedies before the Commission under the circumstances in this case, and did not otherwise err in exercising its jurisdiction in mandamus, *see* NMSA 1978, §§ 44-2-1 to -14 (1884, as amended through 1899). On the merits of NMFF's claim that organizations engaged in lobbying advertising campaigns are not subject to the Commission's jurisdiction, we note that this appeal marks the first time this Court has been asked to construe the State Ethics Commission Act (ECA), §§ 10-16G-1 to -16 (2019, as amended through 2023).[1] Construing the ECA as a whole, together with Article V, Section 17 of the New Mexico Constitution—the constitutional provision creating the Commission—and considering the history and purpose of these provisions, as we must, we conclude that the Legislature intended to grant the Commission broad jurisdiction to enforce all of the registration and reporting requirements of the

_____

[1]The ECA in effect when the petition was filed was last amended in 2021. Therefore, we rely on that version of the ECA and do not consider the 2023 amendments.

Lobbyist Regulation Act (LRA), NMSA 1978, §§ 2-11-1 to -10 (1977, as amended through 2023)[2], including the requirements of Section 2-11-6(I) for organizations, such as NMFF, which are engaged in lobbying advertising campaigns. We, therefore, reverse and remand to the district court with direction to quash the writ and return this case to the Commission for adjudication.

**BACKGROUND**

{2}    Before getting into the procedural background of this case, we first set out the statutory provisions relevant to our discussion. We then proceed with a description of the administrative proceedings undertaken by the Secretary of State (the Secretary) and the Commission that preceded the filing of NMFF's petition for writ of mandamus in the district court. Our review of the administrative proceedings is based on the documents presented by the parties to the district court in support of their positions in the writ proceedings, and is not intended to be a full record of the proceedings before the Commission.

**A.    Statutory Background**

{3}    This appeal requires this Court to interpret several interlocking statutes. The primary statute at issue is the ECA. The ECA creates an independent commission charged with investigating and enforcing New Mexico statutes that impose ethical

---

[2]The LRA in effect when the petition was filed was last amended in 2021. We therefore do not consider the 2023 amendments.

requirements on government officials, and on those running for government office, lobbying government officials, or contracting with the government. The ethics statutes that are included within the jurisdiction of the Commission are generally of two types—statutes that directly require ethical conduct and prohibit fraud or other abuses, and statutes that impose reporting and disclosure requirements, thereby ensuring government transparency.

{4}     This appeal focuses on the authority of the Commission to enforce the LRA, the statute requiring reporting and disclosure of lobbying activities in New Mexico. The LRA requires certain persons engaged in attempting to influence government action to register with the Secretary, and to disclose the identity and interests of those who compensate them or otherwise fund the lobbying activity. The issue on appeal concerns the jurisdiction of the Commission to enforce Section 2-11-6(I) of the LRA, a provision requiring reporting and disclosure by organizations that conduct lobbying advertising campaigns, but do not otherwise lobby. That section reads as follows:

> An organization of two or more persons, . . . that within one calendar year expends funds in excess of two thousand five hundred dollars ($2,500) not otherwise reported under the [LRA] to conduct an advertising campaign for the purpose of lobbying shall register with the [S]ecretary . . . within forty-eight hours after expending two thousand five hundred dollars ($2,500). . . . Within fifteen days after a legislative session, the organization shall report the contributions, pledges to contribute, expenditures and commitments to expend for the advertising campaign for the purpose of lobbying, including the names,

addresses, employers and occupations of the contributors, to the [S]ecretary . . . on a prescribed form.

{5}     Section 10-16G-9(A) of the ECA, a provision describing the Commission's jurisdiction, states as follows:

> The [C]ommission has jurisdiction to enforce the applicable civil compliance provisions for public officials, public employees, candidates, persons subject to the Campaign Reporting Act [(CRA), NMSA 1978, §§ 1-19-25 to -37 (1979, as amended through 2021)], government contractors, *lobbyists and lobbyists' employers* of
>
> . . . .
>
> (4) the [LRA].

(Emphasis added.)

{6}     The final statutory section at issue in this appeal is Section 2-11-8.3(A)(1) (2019, amended 2021), another provision addressing the Commission's jurisdiction, this time a provision codified as part of the LRA:

> [T]he [C]ommission shall have jurisdiction to investigate and adjudicate a complaint alleging a civil violation of a provision of the [LRA] in accordance with the provisions of that act.

**B.     Procedural Background**

**1.     Petitioner NMFF**

{7}     NMFF is a domestic nonprofit organization organized exclusively for social welfare purposes, within the meaning of § 501(c)(4) of the Internal Revenue Code, *see* 26 U.S.C. § 501(c)(4). NMFF was incorporated in New Mexico on June 22, 2021, eight months before it conducted the February 2022 lobbying advertising

4

campaign at issue in this appeal. One of NMFF's purposes is "[t]o advocate for issues important to New Mexicans such as healthcare reform, tax policy, economic justice, and strengthening our democracy." Unlike § 501(c)(3) nonprofits, which are limited to an insubstantial amount of lobbying, organizations with a § 501(c)(4) status are permitted to engage in lobbying, including advertising lobbying campaigns, without endangering their tax-exempt status. *See* § 501(c)(3), (c)(4).

{8}     NMFF was not registered as a lobbyist or lobbyist's employer under Section 2-11-6(A) of the LRA because it did not employ a lobbyist or engage in traditional lobbying by directly contacting legislators. The sole complaint before the Commission concerned NMFF's compliance with the registration and disclosure requirements of Section 2-11-6(I) for organizations that engage in lobbying advertising campaigns.

**2.     NMFF's lobbying advertising campaign**

{9}     In February 2022, NMFF conducted a digital lobbying advertising campaign, spending $36,000 on that campaign. NMFF's lobbying advertisements took a position on legislation awaiting a vote in the 2022 legislative session. The advertisements urged members of the public to call their legislator to urge support or, in some cases, opposition to particular bills. The lobbying advertisements were developed and paid for by NMFF and were distributed from February 3 to February 16, 2022.

{10}    After beginning its lobbying advertising campaign, NMFF registered with the Secretary, as required by Section 2-11-6(I) of the LRA when an organization spends in excess of $2,500 in a calendar year on lobbying advertising

> [a]n organization of two or more persons, . . . that within one calendar year expends funds in excess of two thousand five hundred dollars ($2,500) not otherwise reported under the [LRA] to conduct an advertising campaign for the purpose of lobbying shall register with the [S]ecretary . . . within forty-eight hours after expending two thousand five hundred dollars ($2,500).

Section 2-11-6(I) further requires any organization that is required to register with the Secretary under this section to file a form identifying the contributors to the campaign and the amounts of their contributions

> [w]ithin fifteen days after a legislative session, the organization shall report the contributions, pledges to contribute, expenditures and commitments to expend for the advertising campaign for the purpose of lobbying, including the names, addresses, employers and occupations of the contributors, to the [S]ecretary . . . on a prescribed form.

{11}    NMFF timely filed the required expenditure report with the Secretary on February 17, 2022. NMFF, however, did not list the identity of the contributors to its lobbying advertising campaign, the amounts contributed by each, or each contributor's address and employment.

**3.    The complaint to the Commission and referral to the Secretary**

{12}    The proceeding before the Commission that is the subject of the mandamus petition was initiated by the filing of a complaint with the Commission by State

6

Representative Ambrosio Castellano on April 14, 2022. The Castellano complaint alleged, in relevant part, that NMFF violated Section 2-11-6(I) of the LRA by not filing the required report disclosing the contributors to its lobbying advertising campaign and the amounts contributed after registering with the Secretary during the session.[3] The lobbying registration form for NMFF's lobbying advertising campaign, filed by NMFF with the Secretary during the 2022 legislative session, was attached to the complaint.

{13}    Pursuant to Section 2-11-8.2(B) of the LRA, which sets forth the process the Commission must follow upon receipt of a complaint, the executive director of the Commission found that the complaint was within the Commission's jurisdiction, and referred the complaint to the Secretary for review. Section 2-11-8.2(B) provides that after referral from the Commission, the Secretary must attempt to obtain voluntary compliance with the reporting requirement at issue within twenty days of receiving a complaint. No later than twenty days after receipt, the Secretary must "return the

---

[3]The Castellano complaint also alleged that NMFF violated both the CRA, and the LRA based on post-session mailers sent to Castellano's constituents by NMFF. The portion of the Castellano complaint based on the post-session mailers was dismissed by the Commission upon a finding of no probable cause well before NMFF filed its petition for mandamus in district court. The Commission's jurisdiction over the alleged violations of the CRA and LRA based on the post-session mailers, therefore, was not at issue in the writ proceeding. Accordingly, we focus our discussion on the LRA lobbying advertising campaign reporting violation, which was the sole issue on which the Commission found probable cause and the sole issue raised by the petition for mandamus.

complaint to the . . . [C]ommission and certify to the . . . [C]ommission whether voluntary compliance was achieved." *Id.* "If the [S]ecretary . . . does not certify voluntary compliance, the . . . [C]ommission shall proceed with the complaint pursuant to the terms of the [ECA]." *Id.*

**4.      The Secretary's return of the Castellano complaint to the Commission**

{14}      The Secretary returned the Castello complaint to the Commission on May 9, 2022, with a letter reporting that the Secretary had discovered that NMFF, in fact, had timely filed a lobbying advertising campaign expenditure and contribution form, that the Secretary's office had misplaced the form, and the form had been located and placed on the Secretary's website. The Secretary's letter stated, however, that despite locating the form, her office could not certify compliance with Section 2-11-6(I) because NMFF had failed to disclose the names of the contributors to its lobbying advertising campaign, and the amounts each contributed.

**5.      Proceedings upon return of the complaint to the Commission**

{15}      Upon receipt of the complaint from the Secretary, the Commission's general counsel wrote to NMFF, informing NMFF of the Secretary's finding of noncompliance with the financial disclosure requirements of Section 2-11-6(I). NMFF responded that it had relied on "general corporate support," to fund its lobbying campaign, and that "[t]here were no external contributors or pledges to contribute for this campaign."

8

**6.    Commission's jurisdiction challenged by NMFF**

{16}    On July 28, 2022, NMFF's counsel emailed the Commission's general counsel claiming that new information brought to its attention established that the Commission did not have jurisdiction to enforce Section 2-11-6(I) of the LRA against NMFF, and that the Commission was exceeding the authority delegated to it by the Legislature. NMFF asked the Commission to voluntarily dismiss the complaint.

{17}    The Commission did not dismiss the complaint, and instead made a finding of probable cause to proceed to adjudication on NMFF's alleged violation of Section 2-11-6(I)'s requirement for disclosure of the identity of contributors and amounts contributed to a lobbying advertising campaign. When a hearing officer was appointed by the Commission, NMFF filed a motion to dismiss with the hearing officer. NMFF argued that the Commission's jurisdiction to enforce the LRA extended only to complaints against "individuals" who are "lobbyists and lobbyists' employers," citing the "plain language" of Section 10-16G-9(A) of the ECA. The hearing officer denied the motion to dismiss, explaining that a hearing officer had no authority to determine jurisdiction, this determination was reserved to the

9

Commission's executive director, and there are "[n]o alternative means of determining jurisdiction . . . included in the [law or] regulations."[4]

**7.      NMFF's petition for writ of mandamus**

{18}      NMFF then filed a verified petition for writ of mandamus in district court, initiating the mandamus proceeding that we now review on appeal. The petition asked the district court to issue an alternative writ of mandamus ordering the Commission to cease all proceedings against NMFF and to dismiss the Castellano complaint for lack of jurisdiction, or to show cause why these orders should not issue.

{19}      The petition alleged that the Commission lacked jurisdiction to enforce Section 2-11-6(I) of the LRA against NMFF. As it had in its motion to dismiss before the hearing officer, NMFF claimed that Section 10-16G-9(A) of the ECA, by its plain language, limited the Commission's jurisdiction to an "individual" who is a "lobbyist" or to that "lobbyist's employer," as defined by Section 2-11-2(E) and (F) of the LRA respectively. According to NMFF, the Legislature did not intend to give the Commission jurisdiction to enforce Section 2-11-6(I)'s requirements for

---

[4] The procedure for determining probable cause was changed by the Legislature in a 2023 amendment to Section 10-16G-10(G). The amended section provides for a determination of probable cause by a hearing officer appointed solely for that purpose. This amendment was not in effect at the time the complaint in this case was filed, and, therefore, was not applicable to the proceedings here. We mention the amendment only to avoid confusion, and do not comment on whether the result in this case would have been different if this amendment had applied.

10

"organization[s]" engaged in advertising lobbying, rather than direct lobbying of legislators and officials.

{20} The district court issued an alternative writ of mandamus, temporarily enjoining all proceedings against NMFF in the case pending before the Commission, and requiring the Commission to show cause why the complaint against NMFF should not be dismissed for lack of jurisdiction. The Commission responded with a motion to quash the alternative writ, arguing that the district court should not exercise its mandamus jurisdiction because there was a plain, speedy, and adequate remedy at law, and because exhaustion of administrative remedies before the Commission was required. On the merits of the jurisdictional question, the Commission argued that the scope of its jurisdiction to enforce the LRA was set out in Section 2-11-8.3(A) of the LRA, rather than in Section 10-16G-9(A) of the ECA.

{21} After hearing argument, the district court denied the Commission's motion to quash the writ, and agreed with NMFF on the merits, concluding that the Commission lacked jurisdiction to proceed. The district court ordered the Commission to cease all proceedings and dismiss the complaint against NMFF. The Commission appealed to this Court.

**DISCUSSION**

{22} We first address the Commission's challenge to the district court's authority to entertain NMFF's mandamus petition. We find no error in the district court's

11

decision to issue an alternative writ of mandamus and then to proceed to hear and resolve NMFF's jurisdictional claim on its merits. NMFF's mandamus petition alleged that the Commission had exceeded the limited authority delegated to it by the Legislature, and had done so in an important area of law affecting both the first amendment right to petition the government and a citizen's right to access information about influences on government decisions. We agree with the district court that where obstacles to speedy resolution of the Commission's jurisdiction exist, the district court was not required to remand to the Commission for exhaustion of administrative remedies and did not abuse its discretion by not doing so.

{23}     On the merits, this case raises an important issue of statutory construction. The sole issue before the Commission for adjudication was whether an organization, which engages in a lobbying advertising campaign, is a person intended by the Legislature to be included within the Commission's jurisdiction to enforce the registration and disclosure requirements of the LRA. NMFF argues that the plain language of Section 10-16G-9(A) of the ECA limits the Commission's jurisdiction to "individuals" who influence legislation through personal contact with legislators and government officials. According to NMFF, the Commission lacks jurisdiction because NMFF is an organization and not an individual, and because NMFF engages in lobbying through advertising and not in personal contact with legislators. NMFF claims that this Court should look solely to the plain language of the phrase

12

"lobbyists and lobbyists' employers" in Section 10-16G-9(A) to determine the Legislature's intent. We are not persuaded. We agree with the Commission that the Legislature intended to give the Commission broad jurisdiction to enforce the registration, reporting and disclosure requirements imposed by the LRA both on individuals engaged in direct, personal lobbying, and on organizations engaged in lobbying advertising campaigns.

**I.     The District Court Properly Exercised Its Mandamus Jurisdiction**

{24}     We first address the Commission's argument that the district court lacked authority to review the Commission's jurisdiction by way of mandamus. Mandamus proceedings are closely regulated by statute. *See* §§ 44-2-1 to -14. "Mandamus lies only to compel a public officer to perform an affirmative act where, on a given state of facts, the public officer has a clear legal duty to perform the act and there is no other plain, speedy, and adequate remedy in the ordinary course of the law." *Mimbres Valley Irrigation Co. v. Salopek*, 2006-NMCA-093, ¶ 11, 140 N.M. 168, 140 P.3d 1117.

{25}     The Commission raises three issues concerning the district court's exercise of its mandamus jurisdiction: (1) whether NMFF was required to exhaust its administrative remedies before seeking relief by way of mandamus; (2) whether the district court's mandamus jurisdiction is limited to direct challenges to the

constitutionality of an official's conduct; and (3) whether the district court was required to conduct a trial to resolve facts the Commission claims are disputed.

**A.  NMFF Was Not Required to Exhaust Its Administrative Remedies Before Seeking a Writ of Mandamus**

{26}  The Commission first argues that mandamus was not an appropriate remedy because NMFF was required by statute to exhaust its administrative remedies and obtain a final decision from the Commission, and then seek relief by appeal or petition for writ of certiorari in the district court. According to the Commission, exhaustion of administrative remedies is required, as a matter of law, in every challenge to the jurisdiction of an administrative agency, unless the courts have been given exclusive jurisdiction by statute. The Commission contends reversal is required because "the district court's writ of mandamus violates this bedrock principle of administrative law." We do not agree with the Commission that exhaustion of administrative remedies is mandatory as a matter of law, unless a statute gives the courts exclusive jurisdiction.

{27}  Our Supreme Court in *In re McElveny*, carefully distinguishes between a jurisdictional exhaustion requirement—where "a statute explicitly requires a party to exhaust particular remedies as a prerequisite to judicial review,"—and a common law exhaustion requirement that is "subject to several judge-made exceptions." 2017-NMSC-024, ¶¶ 22-23, 399 P.3d 919 (internal quotation marks and citations omitted). Our Supreme Court notes in *In re McElveny* that the "contours and rigidity

14

of the [jurisdictional and common law exhaustion] requirement[s] differ greatly," and cautions that the two doctrines are "best thought of as two distinct legal concepts." *Id.* ¶ 22 (internal quotation marks and citation omitted). The Commission's argument confuses these two distinct concepts.

{28} "A statute creates an independent duty to exhaust only when it contains 'sweeping and direct' statutory language indicating that there is no jurisdiction prior to exhaustion." *Id.* ¶ 24 (omissions, internal quotation marks, and citation omitted). In contrast, under statutes like the LRA and the ECA, which vest jurisdiction to investigate and adjudicate a dispute in the first instance in a commission or administrative agency, followed by a right of review in the district court, it is the common law doctrine of exhaustion of administrative remedies that governs. *See id.* (providing that where there is no direct or unequivocal statement in a statute requiring exhaustion of administrative remedies or conveying exclusive jurisdiction, prudential principles of common law exhaustion apply).

{29} Importantly, where, as here, common law principles of exhaustion apply, "[a] rigid adherence to administrative exhaustion is not required in circumstances where the doctrine is inappropriate." *Lobato v. N.M. State Env't Dep't*, 2012-NMSC-002, ¶ 12, 267 P.3d 65. Whether application of the common law doctrine of exhaustion is inappropriate lies in the sound discretion of the district court. *See In re McElveny*, 2017-NMSC-024, ¶ 28.

15

{30} We consider, therefore, whether the district court abused its discretion in proceeding in mandamus without requiring NMFF to exhaust its administrative remedies. *See id.* "A district court abuses its discretion if its decision is contrary to logic and reason, or if it exceeds the bounds of reason, all the circumstances before it being considered." *Wallbro v. Nolte*, 2022-NMCA-027, ¶ 21, 511 P.3d 348 (internal quotation marks and citation omitted). We address whether it was unreasonable under the circumstances for the district court to conclude that the administrative remedies available to NMFF were inadequate or that pursuing them would deny NMFF "a plain, speedy and adequate remedy in the ordinary course of law." *See* § 44-2-5.

{31} NMFF argued that there was a significant obstacle to a speedy resolution of its jurisdictional challenge in the proceedings before the Commission, such that pursuing such a course would be futile. *See In re McElveny*, 2017-NMSC-024, ¶ 31 ("A litigant's failure to exhaust administrative remedies can be excused if exhaustion would be futile."). "Futility, as an exception to exhaustion requirements, applies where the agency has deliberately placed an impediment in the path of a party, making an attempt at exhaustion a useless endeavor." *Id.* (internal quotation marks and citation omitted). NMFF argues that, in an attempt to obtain a ruling from the Commission, which could then be appealed to the district court, it filed a motion to dismiss for lack of jurisdiction with the hearing officer. The hearing officer did not

16

rule on the merits of the motion, instead informing NMFF that only the executive director of the Commission was permitted to determine whether a complaint's allegations fall within the jurisdiction of the Commission; and, on that basis, found that he was "prohibited by the provisions of the [ECA] from considering or ruling upon the motion to dismiss for lack of jurisdiction filed by [NMFF] at this stage of the proceedings." According to NMFF, the hearing officer's ruling that he lacked authority to address the Commission's jurisdiction made exhausting the administrative proceeding futile.

{32}     NMFF argues as well that mandamus is appropriate without first exhausting administrative remedies because the jurisdictional issue NMFF raises is a question of law, requiring statutory interpretation, and that factual findings by the administrative agency were not necessary for the district court to proceed in mandamus. NMFF further contends that it would be prejudiced, both by the delay entailed in the administrative proceedings, and by being forced to disclose sensitive information about its donors before obtaining a ruling on whether the Commission was authorized to require this information. The Commission responds that even if exhaustion of administrative remedies is not required as a matter of law (its first argument), jurisdictional facts are in dispute, and therefore, resolution of those factual disputes is required through an adjudicatory hearing before mandamus is appropriate.

{33} Under the circumstances presented by NMFF, we find no abuse of discretion in the district court's decision to entertain NMFF's request for a writ of mandamus without requiring NMFF to exhaust its administrative remedies. The common law doctrine of exhaustion of administrative remedies serves interests of judicial economy by requiring parties to pursue administrative solutions primarily so that questions of fact can be resolved and agency expertise can be applied before judicial relief is sought. *See In re McElveny*, 2017-NMSC-024, ¶ 25; *see also Smith v. City of Santa Fe*, 2007-NMSC-055, ¶ 26, 142 N.M. 786, 171 P.3d 300 (stating that "the exhaustion doctrine exists because the interests of justice are best served by permitting the agency to resolve factual issues within its peculiar expertise" (internal quotation marks and citation omitted)).

{34} Although the Commission argues that facts are in dispute concerning whether NMFF was a "lobbyist" or a "lobbyist's employer," as defined in Section 2-11-2(E), (F) of the LRA, our review of the record reveals that this issue was not before the Commission. The Castellano complaint did not challenge NMFF's failure to register as a lobbyist or lobbyist's employer, pursuant to Section 2-11-6(A) of the LRA, or to comply with Subsections (B) through (H), the disclosure requirements for traditional lobbyists and lobbyists' employers. The sole finding by the Commission of probable cause for adjudication was the allegation that NMFF had violated Section 2-11-6(I)'s disclosure requirements—requirements applicable to NMFF as

an organization that engaged in a lobbying advertising campaign. The Commission does not dispute the facts relevant to NMFF's claim that the Commission lacked jurisdiction to enforce the disclosure requirements of Section 2-11-6(I) of the LRA.[5] Because no probable cause was found by the Commission for any violation of law by NMFF apart from the alleged failure to disclose its donors under Section 2-11-6(I), we do not agree that factual disputes precluded mandamus relief.

{35}    Given the absence of any issue of fact, together with the distinct possibility that administrative procedures might not resolve the jurisdictional question given the hearing officer's ruling on the scope of his authority, we see no abuse of discretion in the district court's decision to proceed by writ of mandamus without requiring exhaustion of administrative remedies.

**B.    The Question Raised by the Petition Is of Sufficient Importance to Justify Mandamus**

{36}    The Commission next argues that mandamus was not appropriate because NMFF's petition does not challenge the constitutionality of the ECA or the LRA. We do not agree that a direct challenge to the constitutionality of a statute or of an official act is required in order to invoke the mandamus jurisdiction of the district

---

[5]Those facts necessary for decision on the Commission's jurisdiction were little more than that NMFF was a nonprofit organization incorporated under New Mexico law, that it had engaged in a lobbying advertising campaign under Section 2-11-6(I) of the LRA, and that it had expended $36,000 in a single calendar year on that campaign.

19

court. All that is required is that "a question of great public import," and that "other remedies might be inadequate to address that question." *State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 18, 120 N.M. 562, 904 P.2d 11 (internal quotation marks and citation omitted).

{37} The analysis of what makes a question of statutory interpretation or other question of law sufficiently important to justify mandamus often, but not always, involves inquiry into the question's potential impact on constitutional rights. This is especially true when mandamus is pursued in an original action in our Supreme Court, rather than in the district court. *See State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 24, 487 P.3d 815. Our Supreme Court, however, has described the mandamus test as flexible and informal. *See id.* ¶ 25. In this case, the district court found that the possibility that the Commission was exceeding the jurisdiction accorded to it by the Legislature was an important question that impacted constitutional rights.

{38} We agree with the district court that the scope of the Commission's jurisdiction is an important question that has an impact on due process rights, government transparency, and delegation of authority by the Legislature. The district court did not err in deciding that the question raised was sufficiently important to justify the court's exercise of its mandamus jurisdiction.

## C.    Trial Was Not Required

{39}    The Commission argues that the district court erred by issuing a writ of mandamus without conducting a trial to determine jurisdictional facts, which the Commission claims were in dispute and had not yet been resolved by the Commission. As we have already explained, we do not agree that the factual questions raised by the Commission in its appellate briefs were before the Commission for decision. The sole issue before the Commission was whether an organization, which engages in a lobbying advertising campaign, is a person within the Commission's LRA enforcement jurisdiction.

{40}    For the reasons stated, we find no error in the district court's exercise of its jurisdiction in mandamus.

## III.   The Legislature Granted the Commission Jurisdiction to Enforce All of the Reporting and Disclosure Provisions of the LRA

{41}    Turning now to the scope of the Commission's jurisdiction, we begin by describing the principles of statutory interpretation that guide our analysis. We then review the history and background of both the ECA and the LRA. Finally, we examine the language used by our Legislature in Section 10-16G-9(A) of the ECA, Section 2-11-8.3 of the LRA and, with the help of the relevant principles of statutory interpretation; we address the intent of our Legislature as to the scope of the Commission's jurisdiction to enforce the LRA's reporting and disclosure requirements.

21

## A. The Guiding Principles of Statutory Interpretation

{42} This case raises a question of statutory construction. "We review questions of statutory interpretation de novo." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022.

{43} We briefly review the recognized principles of statutory construction that are relevant to our inquiry in this case. These principles provide a means to our ultimate goal of "ascertain[ing] and giv[ing] effect to the intent of the Legislature." *Id.* (internal quotation marks and citation omitted). To determine legislative intent, we examine the plain language of the statute, looking to "the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868 (internal quotation marks and citation omitted). "[W]e cannot neglect our obligation to interpret that language in light of the purpose to be achieved and the wrong to be remedied." *D.W. v. B.C.*, 2022-NMCA-006, ¶ 14, 504 P.3d 559 (internal quotation marks and citation omitted). We analyze a statutory provision's function "with reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." *Id.*

## B. History of the ECA

{44} Although this appeal focuses on the Commission's jurisdiction to enforce a single provision of the LRA—Section 2-11-6(I)—the jurisdictional provisions of the

22

ECA were enacted in a broad historical context. Before the enactment of the ECA in 2019, the Legislature engaged in a lengthy effort to create an independent commission to enforce state statutes setting standards for ethical conduct by government officials, candidates for office, and government contractors, as well as multiple state statutes designed to ensure transparency in government by identifying the special interests and the amounts and source of funds spent to influence legislation, government decisions, and elections. We begin our analysis by reviewing this history.

{45}     For many years prior to the enactment of the ECA, the Legislature responded to a series of incidents involving corruption in state government by adopting: (1) substantive ethics standards for state officials, state employees, candidates for elective office, and government contractors; (2) registration and financial disclosure requirements for those seeking to influence the Legislature, government officials, or the outcome of elections; and (3) financial disclosure requirements for government officials, including state legislators, and candidates for state office. *See* Lane Towery, *New Mexico's Indep. Ethics Comm'n and Long Fight to Constrain Pub. Corruption*, 51 N.M. L. Rev. 275, 281-85 (2021) (reviewing the history of ethics legislation in New Mexico from the enactment of the LRA, the CRA, and the Conflict of Interest Act in the 1960's and 1970's (now codified as the Governmental Conduct Act, NMSA 1978, §§ 10-16-1 to -18 (1967, as amended through 2023);

23

through the enactment of the Financial Disclosure Act (FDA), NMSA 1978, §§ 10-16A-1 to -9 (1993, as amended through 2021); the Inspection of Public Records Act (IPRA), NMSA 1978, §§ 14-2-1 to -12 (1993, as amended through 2023) in the 1990's; and the Gift Act, NMSA 1978, §§ 10-16B-1 to -5 (2007, as amended through 2019) in the 2000's, along with significant amendments to these statutes along the way)).

{46} Statutes providing transparency in campaign contributions (the CRA), in the finances of elected government officials (the FDA), and in the amounts spent by lobbyists to influence legislation (the LRA), required those substantially engaged in these activities to file reports with the Secretary, and required the Secretary to make these forms readily available to the public. Although the Secretary was assigned to monitor compliance with the reporting requirements of these statutes, with the exception of fines for failure to file a required form with the Secretary's office, civil enforcement of these government transparency laws fell to the attorney general. The attorney general was also charged with both criminal and civil enforcement of the government ethics legislation. *See* Towery, *supra*, at 289 (noting that the Commission was given civil "jurisdiction to enforce a discrete group of laws which formerly rested with the [a]ttorney [g]eneral"). Enforcement provisions relying solely on a state attorney general that had many other responsibilities was described

by scholars as "[a] major weakness" of many state ethics laws. *Improving the Legis. Process: Fed. Regul. of Lobbying*, 56 Yale L.J. 304, 315 (1947).

{47}   Beginning in 2007, bills were introduced in the Legislature aimed at creating an ethics commission that could enforce the ethics and reporting laws that had been adopted over the years. Efforts to enact legislation creating an ethics commission continued, without success, for a decade. *See* Towery, *supra*, at 284 (reporting that, "[i]n the five years from 2007 to 2012, forty-nine bills creating an ethics commission were introduced in the [L]egislature—and each of them died").

{48}   In 2017, the Legislature introduced a constitutional amendment on the 2018 ballot for the approval of voters that would create an independent ethics commission. *See* 2017 N.M. Laws, Constitutional Amendment 2. The proposed constitutional amendment was overwhelmingly approved, with 75 percent of the voters favoring the creation of the Commission. *See* Towery, *supra*, at 285.

{49}   The amendment adopted by the voters, which became Article V, Section 17(A) of the New Mexico Constitution, establishes the "state ethics commission" as "an independent state agency under the direction of seven commissioners, no more than three" from the same political party. Article V, Section 17(B), the second paragraph of the amendment, provides that

> [t]he . . . [C]ommission may initiate, receive, investigate and adjudicate
> complaints alleging violations of, and issue advisory opinions
> concerning, standards of ethical conduct and other standards of conduct
> and reporting requirements, as may be provided by law, for state

25

> officers and employees of the executive and legislative branches of government, candidates or other participants in elections, lobbyists or government contractors or seekers of government contracts and have such other jurisdiction as provided by law.

The third paragraph of the amendment, Article V, Section 17(C), authorizes the Legislature to enact enabling legislation giving the Commission authority to subpoena witnesses, to require the production of documents, and to "have such other powers and duties and administer or enforce such other acts as further provided by law." *Id.*

{50} Enabling legislation implementing the constitutional amendment, 2019 Laws N.M., ch. 86, was enacted in 2019 during the next legislative session, just months after the voters approved the creation of the Commission. In a single comprehensive law, the Legislature incorporated the provisions of Article V, Section 17(A) of the New Mexico Constitution, *see* 2019 N.M. Laws, ch. 86, § 3, which created the Commission, and provided the procedures the Commission would follow in investigating complaints, 2019 N.M. Laws, ch. 86, § 10; in issuing advisory opinions, 2019 N.M. Laws, ch. 86, § 8; and in conducting adjudicatory hearings on complaints of civil violations, 2019 N.M. Laws, ch. 86, § 12. The Legislature effectuated the broad (but general) language of Article V, Section 17(B), granting the Commission jurisdiction to enforce the civil compliance provisions "for public officials, public employees, candidates, persons subject to the [CRA], government contractors, lobbyists, and lobbyists' employers of" eight statutes and one

26

constitutional provision, *see* 2019 N.M. Laws, ch. 86, § 9(A): the CRA; FDA; Gift Act; Voter Action Act, NMSA 1978, §§ 1-19A-1 to -17 (2003, as amended through 2023); Governmental Conduct Act; Procurement Code, NMSA 1978, §§ 13-1-28 to -199 (1984, as amended through 2023); Anti-Donation Clause of the New Mexico Constitution, art. IX, § 14, as well as the LRA and the ECA itself. The Revised Uniform Law on Notarial Acts, NMSA 1978, §§ 14-14A-1 to -32 (2021, as amended through 2023), was added to the list in 2021. *See* § 10-16G-9(A)(9).

{51}     Although much of Chapter 86, of New Mexico Laws of 2019 was codified as the ECA, *see* §§ 10-16G-1 to -16, approximately half of the sections, s*ee* 2019 N.M. Laws, ch. 86, §§ 17-36, most of them jurisdictional provisions, were codified as amendments or supplements to the individual statutes that the Commission was created to enforce. Included in these separately codified sections of Chapter 86, of New Mexico Laws of 2019, was a provision amending the LRA to give the Commission "jurisdiction to investigate and adjudicate a complaint alleging a civil violation of a provision of the [LRA] in accordance with the provisions of that act." *See* 2019 N.M. Laws, ch. 86, § 21(A)(1) (codified as Section 2-11-8.3(A)) of the LRA.

**C.     History of the LRA**

{52}     The LRA was originally enacted in 1977, and, since that time, it has been amended repeatedly as the nature of lobbying and the laws regulating lobbying have

27

changed. The LRA adopts the approach to lobbying taken by the laws of most other states and the federal government: to require reporting and disclosure, thereby bringing lobbying activities—including the identity of the lobbyists; the interests they are employed to represent; the amounts of money spent to influence legislation; and the source of that money—into public view, rather than prohibiting or limiting either the type of lobbying or the expenditures for lobbying. *See Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996) (listing cases reviewing state lobbying disclosure requirements); *see also Improving the Legis. Process*, *supra*, at 313 (noting that as early as 1947, thirty-five states had state laws aimed at prohibiting lobbying abuses, all of which "proceed on the common principle that undesirable activities can best be controlled, not by prohibition, but by publicity" (footnote omitted)).

{53} A federal law requiring registration by those attempting to influence legislation in Congress was enacted in 1946. *See* Federal Regulation of Lobbying Act of 1946 (the Lobbying Regulation Act), Pub. L. 104-65, § 11(a), 109 Stat. 701, (1995) (codified as 2 U.S.C. § 261-270). The requirements for reporting of expenditures by lobbyists were part of a comprehensive federal statute aimed at improving the political process. *See Improving the Legis. Process*, *supra*, at 305. The approach taken by the federal law was approved by the United States Supreme Court in its decision in *United States v. Harriss*, 347 U.S. 612, 625 (1954). The Court

28

noted that "Congress has not sought to prohibit [pressure from special interest groups]. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose." *Id.* Finding that the intrusion on First Amendment interests from collecting information was minimal, and that the intrusion was outweighed by both the interests of the government in protecting legislators from confusing the will of special interest groups with the will of the public at large, and the interests of the people in exposing the influences operating on legislators, the Supreme Court concluded that the statute was constitutional. *See id.* (approving the Lobbyist Regulation Act's requirements for disclosure of "who is being hired, who is putting up the money, and how much," as a constitutional exercise of Congress's power "to maintain the integrity of a basic governmental process").[6]

{54}     Our Legislature enacted the New Mexico LRA in 1977, more than thirty years after the federal Lobbying Regulation Act was enacted. The 1977 LRA followed the pattern found constitutional in *Harriss*, imposing registration and reporting obligations on individual lobbyists engaged in direct communication with legislators, and requiring the reporting of the expenditures made in "attempting to

---

[6]We note that the constitutionality of the LRA or the ECA is not at issue in this appeal.

29

influence any decision related to any matter to be considered or being considered by the legislative branch of state government." 1977 N.M. Laws, ch. 261, § 2(D).[7]

{55} From 1977 until 1994, the LRA's reporting and disclosure requirements applied to a "lobbyist," defined in 1985 as an "individual" employed to directly influence state legislators, and to a "lobbyist's employer," those who employed and compensated one or more lobbyists, and whose interests were represented by a lobbyist.[8] The reporting requirements adopted by the Legislature in 1977, and listed in Section 2-11-6(A)-(F), of the LRA, required reporting of entertainment and advertising expenses, as well as contributions to legislators, by both a lobbyist and their employer. *See* 1977 N.M. Laws, ch. 261, § 6(A)-(F). These sections remained without significant changes through 1993. *See* 1993 N.M. Laws, ch. 46, § 21(A)-(F).

{56} In 1994, the Legislature amended the LRA to add, in relevant part, the provision that is now codified as Section 2-11-6(I), *see* 1994 N.M. Laws, ch. 84, § 2, the provision primarily at issue in this appeal. Section 2-11-6(I) requires organizations that engage in influencing legislation through a lobbying advertising campaign—rather than through direct contact with legislators—to register with the Secretary and to disclose their expenditures and the contributors to their lobbying

---

[7]We cite the session law here because these LRA definitions have been amended repeatedly since that time and only the session law reflects the original 1977 language.

[8]*See* 1985 N.M. Laws, ch.16, § 1 (codified at Section 2-11-2(E), (F)).

advertising campaigns, just like the individual lobbyists and their employers engaged in direct lobbying.

**{57}** The 1994 amendment followed other states that had expanded their lobbying reporting laws to include lobbying through advertising. *See, e.g.*, *Fla. League of Pro. Lobbyists, Inc.*, 87 F.3d at 458 (reviewing a Florida lobbying statute requiring reporting of all lobbying expenses, including media advertising and publications); *Minn. State Ethical Pracs. Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 510-11 (8th Cir. 1985) (per curiam) (reviewing a Minnesota statute requiring organizations that urge their members to contact legislators to register as lobbyists); *Young Ams. for Freedom, Inc. v. Gorton*, 522 P.2d 189, 191 (Wash. 1974) (en banc) (reviewing a Washington state statute requiring lobbying advertising organizations to register and report the contributors to their campaigns).

**{58}** Section 2-11-6(I) extends the registration and reporting requirements of the LRA to " [a]n organization of two or more persons," that expends funds of $2,500 or more in a single calendar year, not otherwise reported to the Secretary, "to conduct an advertising campaign for the purpose of lobbying." Section 2-11-6(I) of the LRA has not been amended since its adoption in 1994. *Compare* 1994 N.M. Laws, ch. 84, § 2, *with* § 2-11-6(I).

## D. NMFF's Plain Language Argument

{59}     As we have already noted, NMFF's principal contention on appeal is that the plain language of Section 10-16G-9(A) of the ECA unambiguously limits the Commission's enforcement jurisdiction to those provisions of the LRA requiring reporting by a "lobbyist" or a "lobbyist's employer," as those terms are defined in Section 2-11-2(E) and (F) of the LRA. To address NMFF's argument, we cite to the 2019 session law, Chapter 86, as well as to the codification of that law, because, as discussed, although many sections of Chapter 86 were codified as part of the ECA, others were codified as amendments or supplements to the ethics and government transparency statutes listed in Section 10-16G-9(A). The Legislature specifically directed that the sections of Chapter 86 addressing enforcement jurisdiction for a particular statute be codified as part of that statute, not as part of the ECA. Of direct relevance to this appeal, 2019 N.M. Laws, ch. 86, § 21, conferring jurisdiction on the Commission to enforce the LRA, is codified as Section 2-11-8.3 of the LRA.

{60}     Our analysis of the Legislature's intent as to the scope of the Commission's jurisdiction to enforce the LRA's lobbying advertising provision, *see* § 2-11-6(I), and our rejection of NMFF's "plain language" argument based solely on Section 10-16G-9(A), is influenced by the fact (overlooked by both parties in the district court and in their briefs on appeal) that these sections were enacted as part of a single law and must be construed together as a harmonious whole. *See Gonzales v. Middle Rio*

*Grande Conservancy Dist.*, 1987-NMCA-125, ¶ 10, 106 N.M. 426, 744 P.2d 554 ("Statutes are enacted as a whole, and thus each section or part should be construed in connection with every other section or part so as to produce a harmonious whole.").

{61} The language of Chapter 86, Section 9(A) of New Mexico Laws of 2019, codified as Section 10-16G-9(A) of the ECA, states as follows:

> The [C]ommission has jurisdiction to enforce the applicable civil compliance provisions for public officials, public employees, candidates, persons subject to the [CRA], government contractors, *lobbyists and lobbyists' employers* of:
>
> (1)     the [CRA];
>
> (2)     the [FDA];
>
> (3)     the Gift Act;
>
> (4)     the [LRA];
>
> (5)     the Voter Action Act;
>
> (6)     the Governmental Conduct Act;
>
> (7)     the Procurement Code;
>
> (8)     the [ECA]; and
>
> (9)     Article [IX], Section 14 of the [C]onstitution of New Mexico.

(Emphasis added.)

NMFF's plain language argument focuses on the phrase, "lobbyists and lobbyists' employers," in Section 10-16G-9(A), the phrase italicized in the quoted statutory language above. NMFF assumes, without discussion of the basis for its assumption, that these words were intended by the Legislature to incorporate the definition of "lobbyist" from Section 2-11-2(E), and of "lobbyist's employer" from Section 2-11-2(F) of the LRA.

{62}   We do not agree with NMFF that the Legislature's intent can be discerned from the supposedly "plain language" of a single provision. "[C]ourts must exercise caution in applying the plain meaning rule." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352. As our Supreme Court in *Helman* explained:

> [The plain meaning rule's] beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning. In such a case, it can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning. While—as in this case—one part of the statute may appear absolutely clear and certain to the point of mathematical precision, lurking in another part of the enactment, or even in the same section, or in the history and background of the legislation, or in an apparent conflict between the statutory wording and the overall legislative intent, there may be one or more provisions giving rise to genuine uncertainty as to what the legislature was trying to accomplish. In such a case, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute.

*Id.*

{63}     This is such a case. Although NMFF's reading of the phrase "lobbyists or lobbyists' employers," as used in Section 10-16G-9(A), may be plausible when these words are read in isolation, when the statute is read as a whole together with its history, the constitutional provision that created the Commission, and the ethics and reporting statutes the Commission is charged with enforcing, it is apparent that the meaning stated with such certainty by NMFF is not the only possible meaning of this language, and, indeed, that the meaning advocated by NMFF conflicts with other provisions of the legislation.

{64}     We therefore turn a broader lens on the statute, examining the meaning of the term "lobbyist" in the context of the statute as a whole. *See N.M. Pharm. Ass'n v. State*, 1987-NMSC-054, ¶ 8, 106 N.M. 73, 738 P.2d 1318 ("In interpreting statutes, we should read the entire statute as a whole so that each provision may be considered in relation to every other part."); s*ee also Eldridge v. Circle K Corp.*, 1997-NMCA-022, ¶ 29, 123 N.M. 145, 934 P.2d 1074 ("[O]ur task is not to apply language literally when it would lead to counterproductive, inconsistent, and absurd results; we must harmonize the statutory language to achieve the overall legislative purpose.").

{65}     NMFF's exclusive focus on a single phrase in Section 10-16G-9(A) ignores the inclusion by the Legislature of a definitional section in the ECA. The Legislature apparently recognized the difficulty of defining the scope of the Commission's jurisdiction to enforce eight statutes and a constitutional provision, each applicable

35

to different persons, and many including their own definitions of the terms used in that statute. The Legislature addressed this difficulty by including a section in Chapter 86, codified in the ECA as Section 10-16G-2, defining the terms used in the ECA, rather than relying on the varied definitions found in the ethics statutes. Many of the definitions focus on the persons the Legislature intended to subject to the Commission's jurisdiction, the central question here. *See* § 10-16G-2(F), (H), (J), (K) (defining "government contractor," "public agency," "public employee," "public official," and, as directly relevant here, "lobbyist").

{66}     "Lobbyist" is defined in Section 10-16G-2(H), as "a person who is required to register as a lobbyist pursuant to the provisions of the [LRA]." Significantly, the Legislature uses the word "person" to define a "lobbyist," rather than adopting the definition of a lobbyist as an "individual," the language found in Section 2-11-2(E) of the LRA (the definition NMFF argues is incorporated by the ECA). The word "person," when used in a New Mexico statute, is defined by the Uniform Statute and Rule Construction Act, NMSA 1978, § 12-2A-3(E) (1997), to include not just individuals, but also organizations, associations, and corporations: "'person' means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture or any legal or commercial entity."

{67}     Thus, NMFF's argument that the Commission's jurisdiction, as described in Section 10-16G-9(A), is limited solely to "individuals" engaged in lobbying, has

36

specifically been rejected by the Legislature. By using the word "person" in the ECA to define the term "lobbyists," the Legislature has included organizations, associations, and other legal or commercial entities as "lobbyists."

{68} The ECA's definition of "lobbyist" as "a person *who is required to register as a lobbyist pursuant to the provisions of the* [*LRA*]" (emphasis added), § 10-16G-2(H), further defines a "lobbyist" with reference to the registration requirements of the LRA, rather than by any specific type of lobbying or any particular registration requirement. In other words, individuals and organizations that are required by any provision of the LRA to register with the Secretary, are "lobbyists," as the ECA defines that term. There is no limitation to any specific registration requirement— the ECA's language is inclusive of all registration requirements in the LRA.

{69} The definitions of the terms "lobbyist" and "lobbyist's employer," relied on by NMFF, are the definitions adopted in 1977, as amended through 1985, when individual lobbyists influencing legislators through direct personal contact and influence were the only lobbyists required to register with the Secretary. These definitions of "lobbyist" and "lobbyist's employer" remain in the LRA, and continue to define a class of lobbyists composed of individuals who influence legislation through personal contacts and who are required to register with the Secretary and report their compensation and expenditures. *See* § 2-11-2(E) (defining "lobbyist");

37

§ 2-11-6(A)-(H) (listing registration and reporting requirements for individuals and direct lobbyists).

{70}     The LRA has evolved over time, however, to include two types of lobbyists—both of which are required to register with the Secretary and report their activities: individuals who lobby by contacting legislators directly and organizations that lobby through lobbying advertising campaigns. The original LRA definitions of the term "lobbyist" and "lobbyist's employer" did not account for the expansion of the LRA's registration and disclosure requirements, but the ECA definition of "lobbyists and lobbyists' employers" does—a clear statement of legislative intent to include the expanded definitions.

**E.     In Section 2-11-8.3(A), the Legislature Granted the Commission Broad Jurisdiction to Enforce the LRA**

{71}     To the extent there remains any doubt about the meaning of the phrase "lobbyists and lobbyists' employers" as that phrase is used in Section 10-16G-9(A) and in other sections of the ECA, we resolve that doubt by next construing Section 10-16G-9(A) together with the sections of Chapter 86 that specifically confer jurisdiction on the Commission as to each statute listed in Section 10-16G-9(A). *See* 2019 N.M. Laws, ch. 86, §§ 19-34 (conferring jurisdiction as to each of the eight statutes and single constitutional provision). As we have already noted, these jurisdictional provisions were enacted as part of a single session law—2019 New Mexico Laws, Chapter 86—and must be construed together with the provisions of

that law codified as the ECA, as well as with the jurisdictional provisions codified as part of each of the other ethics or government transparency statutes listed in the 2019 New Mexico Laws, Section 9(A) of Chapter 86 (codified as Section 10-16G-9(A)). *See Lujan Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d 545 (holding that statutory provisions must be construed "in the context of the statute as a whole, including its purposes and consequences" (internal quotation marks and citation omitted)).

{72} Looking first at the provisions granting the Commission jurisdiction to enforce each listed statute, we note that it is these provisions that identify in detail any limitation the Legislature intends to impose on the Commission's jurisdiction. *See* 2019 N.M. Laws, ch. 86, §§ 19-34. Many of these sections either limit the persons subject to the Commission's enforcement jurisdiction, or limit the subject matter of the Commission's enforcement jurisdiction for that statute. For example, the Commission is given authority by Chapter 86, Section 25 of New Mexico Laws of 2019, to investigate suspected violations of the Governmental Conduct Act. *See* 2019 N.M. Laws, ch. 86, § 25(A) (codified as Section 10-16-14(A)). Enforcement jurisdiction after an investigation is completed by the Commission, however, is divided among the attorney general, district attorneys, state agencies, and the Legislature itself, depending on the type of official charged with a violation. *Id.* Another example is the Gift Act. Although the Gift Act is listed in Section 10-16G-

9(A) as one of the statutes the Commission "has jurisdiction to enforce," Chapter 86, Section 32 grants the Commission jurisdiction only to investigate complaints of violations of the Gift Act. *See* § 10-16B-5(A). Any violation found must be referred to the attorney general for criminal prosecution. *See* § 10-16B-5(B). The general grant of jurisdiction to the Commission in Section 10-16G-9(A), is thus clarified and focused by these specific jurisdictional provisions.

{73}     The separate provision granting jurisdiction to the Commission to enforce the civil provisions of the LRA, 2019 N.M. Laws, ch. 86, § 21, provides broad jurisdiction to the Commission to "adjudicate" complaints of civil violations of the LRA. Chapter 86, Section 21(A)(1) of New Mexico Laws reads as follows:

> The . . . [C]ommission shall have jurisdiction to investigate and adjudicate a complaint alleging a civil violation of a provision of the [LRA] in accordance with the provisions of that act.

*See* § 2-11-8.3(A).

{74}     Subsections (A) and (B) of Chapter 86, Section 21 of 2019 N.M. Laws, address the division of authority between the Secretary and the Commission. These sections direct the Secretary to forward complaints alleging violation of the LRA to the Commission, and direct the Secretary and the Commission together to prepare recommendations for amendments to the LRA in time for the 2021 legislative session, "necessary for the efficient administration and enforcement of the provisions of that act." Section 2-11-8.3(B) (2019).

40

{75} The enactment by the Legislature of a clear grant of jurisdiction to the Commission in the same law as the section relied on by NMFF—using mandatory language stating that the Commission "*shall have jurisdiction* to investigate and adjudicate a complaint alleging a civil violation of a provision of the [LRA]"—leaves no doubt about the intent of the Legislature. *See* N.M. Laws 2019, ch. 86, § 21(A)(1). When Section 2-11-8.3(A) of the LRA is construed "in the context of the statute as a whole," *Lujan Grisham*, 2021-NMSC-009, ¶ 23 (internal quotation marks and citation omitted), as it must be, it is apparent that the Legislature relied on this section of Chapter 86, now Section 2-11-8.3(A), to confer broad jurisdiction on the Commission to enforce the LRA's registration, reporting, and disclosure requirements. Because restrictions on the Commission's jurisdiction over categories of persons, or over particular subject matter are included in many of the statute-specific jurisdictional provisions found in Chapter 86, but are absent from the provision conferring jurisdiction on the Commission to enforce the LRA, we presume that the absence of restrictions is intentional. *See State v. Coble*, 2023-NMCA-079, ¶ 10, 536 P.3d 519 (noting that when the Legislature includes particular language in one portion of a statute and omits it from another, "we must presume the Legislature intentionally omitted it").

{76} We conclude, therefore, that our Legislature granted the Commission jurisdiction to enforce the registration and reporting requirements of the LRA against

41

all "persons," both individuals and organizations, that are required by the terms of the LRA to register with the Secretary. This includes both individual lobbyists, who are engaged in direct face-to-face lobbying of legislators and are required to register by Section 2-11-6(A)-(H), and lobbyist organizations, including NMFF, that are required by Section 2-11-6(I) to register with the Secretary when they conduct "an advertising campaign for the purpose of lobbying." We reverse the district court's decision to the contrary.

**CONCLUSION**

{77}     We reverse and remand, directing the district court to vacate its writ of mandamus, and return this case to the Commission for further proceedings consistent with this opinion.

{78}     **IT IS SO ORDERED.**


_____
**JANE B. YOHALEM, Judge**

**WE CONCUR:**


_____
**JENNIFER L. ATTREP, Judge**


_____
**KATHERINE A. WRAY, Judge**

42